# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION AND THE STATES OF ALABAMA; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; FLORIDA; GEORGIA; ILLINOIS; INDIANA; IOWA; KANSAS; KENTUCKY; LOUISIANA; MAINE; MARYLAND; MASSACHUSETTS; MICHIGAN; MISSOURI; MONTANA; NEBRASKA; NEVADA; NEW HAMPSHIRE; NEW JERSEY; NEW MEXICO; NEW YORK; NORTH CAROLINA; OHIO; OKLAHOMA; OREGON; PENNSYLVANIA; TENNESSEE; TEXAS; UTAH; VIRGINIA; WASHINGTON; WEST VIRGINIA; WISCONSIN; WYOMING; AND THE DISTRICT OF COLUMBIA;<br><br>      Plaintiffs,<br><br>   vs.<br><br>ASSOCIATED COMMUNITY SERVICES, INC., a Michigan corporation, also d/b/a A.C. SERVICES;<br><br>CENTRAL PROCESSING SERVICES, LLC, a Michigan limited liability company;<br><br>COMMUNITY SERVICES APPEAL, LLC, a Michigan limited liability company; | Case Number:<br><br><br><br>**COMPLAINT** |

THE DALE CORPORATION, a
Michigan corporation;

DIRECTELE, INC., a Michigan
corporation;

ROBERT WILLIAM "BILL"
BURLAND, individually and as an
owner, officer, director, or manager of
ASSOCIATED COMMUNITY
SERVICES, INC., CENTRAL
PROCESSING SERVICES, LLC,
COMMUNITY SERVICES APPEAL,
LLC, DIRECTELE, INC., and THE
DALE CORPORATION;

RICHARD T. COLE, individually and
as an owner, officer, director, or
manager of ASSOCIATED
COMMUNITY SERVICES, INC.,
CENTRAL PROCESSING
SERVICES, LLC, COMMUNITY
SERVICES APPEAL, LLC,
DIRECTELE, INC., and THE DALE
CORPORATION;

AMY BURLAND, individually and as
an owner and officer of
COMMUNITY SERVICES APPEAL,
LLC;

BARBARA COLE, individually and
as an owner and officer of
COMMUNITY SERVICES APPEAL,
LLC;

SCOT STEPEK, individually and as
an officer, director, or manager of
ASSOCIATED COMMUNITY
SERVICES, INC., CENTRAL

PROCESSING SERVICES, LLC, and
COMMUNITY SERVICES APPEAL,
LLC;

NIKOLE GILSTORF, formerly
known as Nikole Luton and Nikole
Dicks, individually and as a manager
of ASSOCIATED COMMUNITY
SERVICES, INC., and as an owner,
officer, or manager of DIRECTELE,
INC., and THE DALE
CORPORATION;

ANTONIO G. LIA, individually and
as a manager of ASSOCIATED
COMMUNITY SERVICES, INC.,
and as an officer or manager of
DIRECTELE, INC., and THE DALE
CORPORATION; and

JOHN LUCIDI, individually and as a
manager of ASSOCIATED
COMMUNITY SERVICES, INC.;

Defendants.

Plaintiffs, the Federal Trade Commission ("FTC"), the Attorneys General of

the states of Alabama, California, Colorado, Connecticut, Delaware, Florida,

Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,

Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Hampshire,

New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon,

Pennsylvania, Tennessee, Texas, Utah, Virginia, Washington, West Virginia,

Wisconsin, and Wyoming, and the District of Columbia; the Secretaries of State of

Colorado, Georgia, Maryland, North Carolina, and Tennessee; and the Florida
Department of Agriculture and Consumer Services and the Utah Division of
Consumer Protection (collectively "Plaintiffs"), for their Complaint allege:

## SUMMARY OF THE CASE

1.      Defendants have made abusive, unsolicited, deceptive fundraising
calls that intruded into the lives of hundreds of millions of Americans. Through
more than 1.3 billion fundraising calls to more than 67 million unique telephone
numbers, Defendants sought to extract money from donors by making deceptive
claims about practically nonexistent charitable programs. Defendants knowingly
duped generous Americans into donating tens of millions of dollars to nonprofit
organizations that they claimed helped breast cancer patients, the families of
children with cancer, homeless veterans, fire victims, and more. In reality, almost
no money went to the charitable purposes the Defendants described to donors.

2.      Acting as a common enterprise, Associated Community Services, Inc.
("ACS"), and its sister companies, Central Processing Services, LLC ("CPS"), and
Community Services Appeal, LLC ("CSA") (collectively the "ACS Corporate
Defendants"), solicited charitable contributions for numerous ostensibly charitable
organizations from at least 2008 through early September 2019. These nonprofit
organizations typically paid the ACS Corporate Defendants between 80 and 90
percent of every donation. Deceptive claims about the nonprofits' supposed

charitable programs pervaded these solicitations. Since at least 2018 and continuing to the present, Directele, Inc. ("Directele"), and The Dale Corporation ("Dale Corp.") (collectively the "Directele Corporate Defendants"), also acting as a common enterprise, have made similar deceptive fundraising claims.

3.      Defendants drafted and designed the telemarketing scripts and written solicitation materials to tug at donors' heartstrings and to maximize contributions with little regard for truthfulness or accuracy. Their false or misleading claims included promises that donations to children's cancer charities would provide financial assistance to families with children suffering from cancer, that donations to women's cancer charities would be used to pay past-due rent or utility bills for low-income women fighting cancer or provide free cancer screenings, that donations to firefighters' charities would help provide financial assistance to fire victims, and that donations to veterans charities would help house homeless veterans. On some occasions, as with statements that donations would help provide cancer patients with pain medication, the charitable programs described to donors were fictitious. Many other times, Defendants misled donors by saying that contributions would be spent supporting particular programs when in fact the nonprofit organizations for which they solicited spent mere pennies—often five percent or less of the donations—on those programs. Defendants also routinely claimed that contributions would benefit donors' "local area" or be used

"nationwide," when in fact, the referenced programs—when they existed at all— were available only in limited geographic areas not local to the vast majority of the individuals solicited.

4.      The ACS Corporate Defendants knew that almost none of donors' contributions would be spent supporting the charitable programs they touted because they typically reviewed and analyzed the financial and other information contained in the tax returns (Form 990s) and audited financial statements of the nonprofits for which they solicited (such documents are publicly available for many charities). They also reviewed nonprofits' websites, and asked the nonprofits for substantiation for the claims in scripts and written materials. In numerous instances, although the substantiation the ACS Corporate Defendants received did not support the claims, and they knew that contributions would not be spent as described, they persisted in making deceptive claims about the use of donated funds. The Directele Corporate Defendants also know, or should know, that in many instances the nonprofits for which they solicit spend only an incidental amount of contributions on causes described to donors.

5.      The ACS Corporate Defendants were the primary fundraisers for the now-defunct sham charities Cancer Fund of America, Inc. ("Cancer Fund"), Children's Cancer Fund of America, Inc. ("Children's Cancer Fund"), and The Breast Cancer Society, Inc. ("The Breast Cancer Society"), that were sued by the

FTC, all 50 states, and the District of Columbia in 2015. *FTC, 50 States, and D.C. v. Cancer Fund of America, Inc., et al.,* Civil Action No. 2:15-cv-00884-NVW (D. Ariz., complaint filed May 18, 2015). On behalf of these sham charities, the ACS Corporate Defendants deceptively described the purported aid to cancer patients that donors' contributions would support. Among other misrepresentations, the ACS Corporate Defendants routinely claimed—falsely— that donations would help provide dying children with hospice care or help women suffering with breast cancer obtain pain medication. They made these false claims while knowing that the sham charities spent almost no money on any charitable purpose and did not pay for hospice care or provide pain medication at all.

6.      Well-meaning donors responded to the deceptive claims made by the ACS Corporate Defendants. In the most recent three-year period for which financial records are available (2016 through 2018), donors contributed more than $90 million for the charitable programs described by the ACS Corporate Defendants. From that amount, the ACS Corporate Defendants were paid more than $77 million. Between 2008 and 2015, the ACS Corporate Defendants were paid more than $118 million for their role in deceptively soliciting for the sham charities Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society.

7.      The ACS Corporate Defendants stopped fundraising in September 2019, but the Directele Corporate Defendants stepped into their shoes and are

continuing the deceptive fundraising scheme. Under the direction of former ACS Senior Managers Nikole Gilstorf ("Gilstorf") and Antonio "Tony" Lia ("Lia"), in consultation with Defendant Richard "Dick" Cole ("Cole"), the Directele Corporate Defendants have contracted with several of the nonprofits for which the ACS Defendants solicited under substantially similar terms. They hired numerous former ACS telemarketers and continue to solicit charitable contributions using the same types of false or misleading claims. They also hired several former ACS and CPS management, technology, and administrative employees. In 2020, the Directele Corporate Defendants expanded their operations to phone rooms in the Philippines and India.

8.     Defendants' false or misleading fundraising claims violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.3(a) and (d), as well as state statutes regulating charitable solicitations and prohibiting deceptive and unfair trade practices.

9.     The ACS Corporate Defendants generated the vast majority of their fundraising revenue through telemarketing. In at least 90 percent of the more than 1.3 billion fundraising calls ACS initiated from 2016 through September 2019, telemarketers did not speak directly with donors. Instead, ACS employees used soundboard technology to communicate with the individuals they called via

prerecorded messages. With this technology, rather than responding to donors' questions and comments verbally, soundboard operators played prerecorded audio clips. Each call started with a standard prerecorded message requesting a donation, after which the soundboard operator could play additional recorded audio clips to respond to questions and further encourage a donation. At ACS, soundboard operators typically handled three fundraising calls at a time, wearing headsets at each ear and at their temples, and using three keyboards to select the audio clips to play in response to call recipients' questions. ACS employees described entries on these keyboards as made with the soundboard operator's left hand, right hand, and "middle hand." After taking over the Directele Corporate Defendants, Gilstorf and Lia introduced the use of soundboard by Directele as well.

10.     Fundraising calls that use soundboard technology to play prerecorded messages to communicate with donors violate the Telemarketing Sales Rule's prohibition against initiating outbound telephone calls that deliver prerecorded messages. 16 C.F.R. § 310.4(b)(1)(v).

11.     Because each soundboard operator routinely handles multiple calls at a time, ACS could and Directele can contact many more people, much more frequently, than a traditional telemarketing company that uses live agents to speak directly to people. Not only did ACS call more than 67 million telephone numbers more than 1.3 billion times, it called many of those numbers repeatedly in a short

time period. For example, ACS called more than 1.3 million numbers 10 or more times in a single week. It called more than 7.8 million numbers two or more times in an hour. This pattern of repeated and continuous calling violates the Telemarketing Sales Rule's prohibition against calling telephones repeatedly or continuously with intent to annoy, abuse, or harass any person and similar prohibitions in the laws of Nevada and Washington. 16 C.F.R. § 310.4(b)(1)(i); WASH. REV. CODE § 19.09.100(17); NEV. REV. STAT. § 598.0918(2).

12.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108, and the TSR promulgated thereunder, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the TSR, 16 C.F.R. Part 310.

13.     This action is also brought, in their representative and official capacities as provided by state law, by the attorneys general of Alabama, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New

Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah,[1] Virginia, Washington, West Virginia, Wisconsin, and Wyoming (collectively the "Attorneys General"); and the secretaries of state of Colorado, Georgia, Maryland, North Carolina, and Tennessee (collectively the "Secretaries of State"); and the Florida Department of Agriculture and Consumer Services. The Plaintiffs identified in this paragraph are referred to collectively as the "Plaintiff States."

14.     The Plaintiff States bring this action pursuant to consumer protection, business regulation, charitable solicitation, and/or charitable trust enforcement authority conferred on their attorneys general, secretaries of state, and/or state agencies by state law and/or pursuant to *parens patriae* and/or common law authority. These state laws authorize the Plaintiff States to seek temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief, to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' state law violations. These laws also authorize the Plaintiff States to obtain civil penalties, attorneys' fees, expenses, and costs.

---

[1] As used here, the attorney general of Utah refers to the Utah Attorney General, including as counsel to the Utah Division of Consumer Protection.

15.     This action is also brought by the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia pursuant to Section 6103(a) of the Telemarketing Act, which authorizes attorneys general to initiate federal district court proceedings and seek to enjoin violations of, and enforce compliance with, the TSR to obtain damages, restitution, and other compensation, and to obtain such further and other relief as the court may deem appropriate to stop Defendants' violations of the TSR. 15 U.S.C. § 6103(a).

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. §§ 6102(c)(1), 6103(a), and 6105(b). This Court has supplemental jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), and (d), and 15 U.S.C. §§ 53(b) and 6103(e).

## PLAINTIFFS

18.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Pursuant to the Telemarketing Act, the FTC promulgated and

enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

19.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).

20.    The Attorneys General of the Plaintiff States are the chief legal officers for their respective states and commonwealths. The Secretaries of State and the Florida Department of Agriculture and Consumer Services are the chief regulators of charities and charitable solicitations for their respective states, and are authorized to enforce their states' laws regarding the solicitation of charitable donations. The Plaintiff States bring this action pursuant to consumer protection, business regulation, charitable solicitation, and/or charitable trust enforcement authority conferred on them by the following statutes and/or pursuant to *parens patriae* and/or common law authority. The states of Iowa and Oregon and the District of Columbia do not join in the complaint allegations with respect to the Directele Corporate Defendants.

| STATE | STATUTORY AUTHORITY |
|-------|---------------------|
| Alabama | ALA. CODE §§ 8-19-1 through -15; and 13A-9-70 through 76. |

| STATE | STATUTORY AUTHORITY |
|---|---|
| California | CAL. BUS. & PROF. CODE §§ 17200 through 17206, and §§ 17510 through 17510.95; CAL. GOV. CODE §§ 12580 through 12599.8. |
| Colorado | COLO. REV. STAT. §§ 6-1-101 through 115; and 6-16-101 through 114. |
| Connecticut | CONN. GEN. STAT. §§ 21a-175 through 21a-190l; and 42-110a through 42-110q. |
| Delaware | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida | FLA. STAT. ch. 501, pt. II; and ch. 496 (2020). |
| Georgia | GA. CODE ANN. §§ 10-1-390 through 10-1-408 (2017); and 43-17-1 through 43-17-23 (2016). |
| Illinois | 225 ILL. COMP. STAT. §§ 460/0.01 through 460/23. |
| Indiana | IND. CODE §§ 23-7-8-1 through -9; and 24-5-0.5-1 through -12. |
| Iowa | IOWA CODE § 714.16. |
| Kansas | KAN. STAT. ANN. §§ 17-1759 through 17-1776. |
| Kentucky | KY. REV. STAT. ANN. §§ 367.110 through 367.933. |
| Louisiana | LA. REV. STAT. ANN. §§ 51:1401 through 1427; and 51:1901 through 1909.1. |
| Maine | ME. REV. STAT. tit. 5, §§ 205-A through 214 (2019). |
| Maryland | MD. CODE ANN., BUS. REG. §§ 6-101 through 6-701 (LexisNexis 2015 and 2020 Suppl.). |
| Massachusetts | MASS. GEN. LAWS ch. 12 §§ 8 through 8M, 10; ch. 68 §§ 18 through 35; ch. 93A § 1 through 11. |
| Michigan | MICH. COMP. LAWS §§ 400.271 through 400.294. |
| Missouri | MO. REV. STAT. ch. 407. |
| Montana | MONT. CODE ANN. §§ 30-14-103 and 30-14-111. |
| Nebraska | NEB. REV. STAT. §§ 21-1901 through 21-19,177; 59-1601 through 59-1622; and 87-301 through 87-306. |
| Nevada | NEV. REV. STAT. §§ 598.1305, 598.0915(15), 598.096, and 598.0963. |
| New Hampshire | N.H. REV. STAT. ANN. §§ 7:19; 7:20; 7:21; 7:24; 7:28; 7:28-c; 7:28-f; 358-A:2; 358-A:4; 359-E:5; and 641:8. |
| New Jersey | N.J. STAT. ANN. §§ 45:17A-18 through 45:17A-40; 56:8-1 through 56:8-226; and N.J. ADMIN. CODE §§ 13:48-1.1 through 13:48-15.1. |

| STATE | STATUTORY AUTHORITY |
|---|---|
| New Mexico | N.M. STAT. ANN. 1978, §§ 57-12-1 through 57-12-22; and 57-22-1 through 57-22-11. |
| New York | N.Y. EXEC. LAW §§ 63(12) and 171-a through 175; N.Y. GEN. BUS. LAW § 349; and N.Y. NOT-FOR-PROFIT CORP. LAW § 112. |
| North Carolina | N.C. GEN. STAT. §§ 75-1.1 *et seq.*; and 131F-1 *et seq.* |
| Ohio | OHIO REV. CODE ANN. ch. 1716. |
| Oklahoma | OKLA. STAT. tit. 18 §§ 552.1 through 552.22. |
| Oregon | OR. REV. STAT. §§128.801 through 128.898, 646.605 through 646.642, 646A.370 through 646A.376, and 180.060(7). |
| Pennsylvania | PA. STAT. TITLE 10 §§ 162.1 through 162.24. |
| Tennessee | TENN. CODE ANN. §§ 48-101-501 through 48-101-522. |
| Texas | TEX. BUS. & COM. CODE ANN. §§ 17.41 through 17.63. |
| Utah | UTAH CODE ANN. §§13-22-1 through 13-22-23; 13-26-1 through 13-26-11; and 13-11-1 through 13-11-23. |
| Virginia | VA. CODE ANN. §§ 57-48 through 57-69. |
| Washington | WASH. REV. CODE §§ 19.86, 19.09, and 80.36. |
| West Virginia | W. VA. CODE §§ 29-19-1 through 15b; and §§ 46A-1-101 through 46A-6-110. |
| Wisconsin | WIS. STAT. §§ 202.11 through 202.18. |
| Wyoming | WYO. STAT. ANN. §§ 40-12-101 through 114. |

21.     Pursuant to authority found in 15 U.S.C. § 6103(a), the Plaintiff Attorneys General are also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

## DEFENDANTS

22.    The ACS Corporate Defendants (ACS, CPS, and CSA) hold themselves out to be different entities and are structured as independent corporations. In reality, they operated as a single enterprise. ACS and CPS were both owned by Individual Defendants R. William "Bill" Burland ("Burland") and Cole, while CSA was owned by their respective spouses, Amy Burland and Barbara Cole. (Bill and Amy Burland relinquished their ownership interests in ACS, CPS, and CSA in August 2019.) Each of the ACS Corporate Defendants played a different role in the solicitation process but they all worked toward a common purpose. The three companies were so intertwined that one could not readily have operated without the others. The Directele Corporate Defendants are similarly interdependent. They share the same owners and officers, the same location, and together provide nonprofits with a turnkey fundraising operation.

### *Associated Community Services ("ACS")*

23.    Defendant Associated Community Services, Inc., also doing business as A.C. Services, a Michigan corporation, was formed in 1999 by co-owners Burland and Cole. Through at least September 6, 2019, ACS engaged in the business of professional fundraising via telemarketing. Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, ACS made misrepresentations while soliciting charitable contributions, placed telephone calls

that delivered prerecorded messages, and initiated telephone calls to individuals repeatedly in such volume and frequency as to annoy, abuse, or harass the call recipients.

24.     ACS filed a petition to reorganize under Chapter 11 of the Bankruptcy Code in March 2014. ACS's plan of reorganization was confirmed in April 2015 and the bankruptcy estate was fully administered by May 2017. In connection with its bankruptcy, ACS was sued by the U.S. Department of Justice. Amended Compl. (Dkt. 23), *U.S. v. Associated Cmty. Servs., Inc.* (*In re: Associated Cmty. Servs., Inc.*), No. 15-05029-PJS (Bankr. E.D. Mich. Dec. 14, 2015). Pursuant to a settlement of that action, the court excepted claims by government agencies against ACS related to its solicitations for Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society from discharge and the terms of ACS's reorganization plan.

25.     ACS has a long history of alleged violations of state law. Over the years, it has been the target of at least sixteen state actions, paying hundreds of thousands of dollars in fines and penalties and agreeing to solicitation bans in some states, including some of the Plaintiff States. In numerous instances, these actions alleged that ACS had engaged in deceptive fundraising practices. (*See* Appendix A for a list of such actions.)

26.     ACS shut down its telemarketing operations and informed the nonprofit organizations for which it solicited that it was closing in September

2019. From April 2016 until that time, ACS's principal place of business was 23800 West 10 Mile Road, Suite 200, Southfield, MI 48033. At least from 2007 through October 2017, ACS also operated a telemarketing call center at 23400 Michigan Ave., Suite 100, Dearborn, MI 48124. At all times material to this complaint, ACS transacts or has transacted business in this District and throughout the United States and has operated in a common enterprise with Defendants CPS and CSA.

### *Central Processing Services ("CPS")*

27.     Defendant Central Processing Services, LLC, is a Michigan limited liability company that was formed in 2004 by co-owners Burland and Cole. Through at least September 6, 2019, CPS engaged in the business of providing fundraising-related services to ACS, CSA, and the nonprofit organizations for which they solicited. CPS ceased operating and informed these nonprofit organizations that it was closing in September 2019. From April 2016 until then, its principal place of business was shared with ACS at 23800 West 10 Mile Road, Suite 220, Southfield, MI 48033.

28.     CPS filed a petition to reorganize under Chapter 11 of the Bankruptcy Code in March 2019. Although CPS proposed a plan of reorganization in July 2019, it later withdrew the plan after several creditors (including the FTC and the states of Kansas, Maryland, and Michigan) objected. Based on a motion by the

United States, the bankruptcy court dismissed the bankruptcy case in September 2019, finding there was no feasible way for CPS to reorganize successfully and that CPS had not paid its post-petition taxes.

29.     Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, CPS made misrepresentations while soliciting charitable contributions and knowingly and substantially assisted others in making such misrepresentations. CPS also knowingly and substantially assisted ACS in initiating telephone calls that delivered prerecorded messages and in causing telephones to ring repeatedly or continuously in such volume and frequency as to annoy, abuse, or harass the call recipient. At all times material to this complaint, CPS transacts or has transacted business in this District and throughout the United States and has operated in a common enterprise with Defendants ACS and CSA.

### Community Services Appeal ("CSA")

30.     Defendant Community Services Appeal, LLC, a Michigan limited liability company, was formed by co-owners Defendants Amy Burland and Barbara Cole in April 2009. CSA also ceased operating in September 2019. Until then, its principal place of business was shared with ACS and CPS at 23800 West 10 Mile Road, Suite 299, Southfield, MI 48033. CSA (through CPS employees) created direct mail marketing solicitations and provided consulting services to the same nonprofit organizations that contracted with ACS. Acting alone or in concert

with others, directly or indirectly, CSA made misrepresentations while soliciting charitable contributions and knowingly assisted others in making such misrepresentations. At all times material to this complaint, CSA transacts or has transacted business in this District and throughout the United States and has operated in a common enterprise with Defendants ACS and CPS.

### *Directele, Inc. ("Directele")*

31.     Defendant Directele, Inc. ("Directele"), is a Michigan corporation with its principal place of business located at 28091 Dequindre Rd. #302, Madison Heights, MI 48071. Directele is engaged in the business of professional fundraising via telemarketing. Since at least 2018 through September 2019, Directele operated in concert with the ACS Corporate Defendants and Defendants Burland, Cole, and Gilstorf. In October 2019, Defendant Gilstorf purchased Directele. Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, Directele has made misrepresentations while soliciting charitable contributions and placed calls that deliver prerecorded messages. At all times material to this complaint, Directele transacts or has transacted business in this District and throughout the United States. Directele operates in a common enterprise with Defendant Dale Corp.

### The Dale Corporation ("Dale Corp.")

32.     Defendant The Dale Corporation ("Dale Corp.") is a Michigan corporation that shares a principal place of business with Directele (in the same building) at 28091 Dequindre Rd. Ste. #301, Madison Heights, MI 48071. Since at least 2018 through September 2019, Dale Corp. operated in concert with the ACS Corporate Defendants and Defendants Burland, Cole, and Gilstorf. In October 2019, Defendant Gilstorf purchased Dale Corp. Acting alone or in concert with others, directly or indirectly, Dale Corp. has made misrepresentations while soliciting charitable contributions and knowingly and substantially assisted Directele in making such misrepresentations. Dale Corp. has also knowingly and substantially assisted Directele in initiating telephone calls that delivered prerecorded messages. At all times material to this complaint, Dale Corp. transacts or has transacted business in this District and throughout the United States. Dale Corp. operates in a common enterprise with Defendant Directele.

### R. William "Bill" Burland ("Burland")

33.     Defendant R. William "Bill" Burland co-founded ACS and CPS with Defendant Cole. Together they co-owned and shared management responsibilities for the two companies until at least August 1, 2019, when Burland relinquished his interests in ACS and CPS. Burland also participated in, controlled, or had the authority to control the acts of CSA. Since May 2018 and at least through August

1, 2019, Burland also participated in, controlled, and/or had the authority to control the acts of the Directele Corporate Defendants. He is married to Defendant Amy Burland.

34.    At all times material to this Complaint, acting alone or in concert with others, Burland formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the ACS Corporate Defendants and the Directele Corporate Defendants, including the acts and practices set forth in this Complaint. Burland resides in this District. In connection with the matters alleged herein, he transects or has transacted business in this District and throughout the United States.

### Richard T. Cole ("Cole")

35.    Defendant Richard T. "Dick" Cole owns ACS and CPS. Until at least August 1, 2019, he co-owned and shared management responsibilities for ACS and CPS with Defendant Burland. Cole also participated in, controlled, and/or had the authority to control, the acts of CSA. Since at least May 2018, Cole has also participated in, controlled, and/or had the authority to control the acts of the Directele Corporate Defendants. He is married to Defendant Barbara Cole.

36.    At all times material to this Complaint, acting alone or in concert with others, Cole formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the ACS Corporate Defendants and the

Directele Corporate Defendants, including the acts and practices set forth in this Complaint. Cole resides in this District. In connection with the matters alleged herein, he transacts or has transacted business in this District and throughout the United States.

### *Amy Burland*

37.    Defendant Amy Burland co-owned CSA and shared its management duties with Barbara Cole from its formation at least through August 1, 2019, when she relinquished her interest in CSA. She is married to Defendant Burland. At all times material to this Complaint, acting alone or in concert with others, Amy Burland formulated, directed, controlled, had the authority to control, or participated in the acts and practices of CSA, including the acts and practices set forth in this Complaint. Amy Burland resides in this District. In connection with the matters alleged herein, she transacts or has transacted business in this District and throughout the United States.

### *Barbara Cole*

38.    Defendant Barbara Cole owns CSA. She shared ownership and management duties with Amy Burland from its formation until at least August 1, 2019, when Amy Burland relinquished her interest in CSA. Barbara Cole is married to Defendant Cole. At all times material to this Complaint, acting alone or in concert with others, Barbara Cole has formulated, directed, controlled, had the

authority to control, and/or participated in the acts and practices of CSA, including the acts and practices set forth in this Complaint. Barbara Cole resides in this District. In connection with the matters alleged herein, she transacts or has transacted business in this District and throughout the United States.

### Scot Stepek ("Stepek")

39.     Defendant Scot Stepek was employed in senior management positions within ACS and CPS for more than 20 years, until at least August 2019. He has held various positions, including ACS Senior Manager, ACS Vice President, and, most recently, Chief Executive Officer ("CEO") of CPS. At all times material to this Complaint, acting alone or in concert with others, Stepek formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices of the ACS Corporate Defendants, including the acts and practices set forth in this Complaint. Stepek resides in this District. In connection with the matters alleged herein, he transacts or has transacted business in this District and throughout the United States.

### Nikole Gilstorf ("Gilstorf")

40.     Defendant Nikole Gilstorf, formerly known as Nikole Luton and Nikole Dicks, served as a Senior Manager at ACS. She was employed by ACS for 24 years, until September 2019. Gilstorf was the Chief Operating Officer ("COO") of the Directele Corporate Defendants between around November 2018 and

October 2019. In October 2019, Gilstorf bought Directele and Dale Corp. She and Defendant Antonio "Tony" Lia ("Lia") then became co-Presidents of the two companies. At all times material to this Complaint, acting alone or in concert with others, Gilstorf has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ACS and the Directele Corporate Defendants, including the acts and practices set forth in this Complaint. Gilstorf resides in this District. In connection with the matters alleged herein, she transacts or has transacted business in this District and throughout the United States.

### *Antonio "Tony" Lia ("Lia")*

41.    Defendant Antonio "Tony" Lia, also known as Anthony Lia and Tony Lia, served as a Senior Manager at ACS. He was employed by ACS for more than 20 years, until September 2019. In October 2019, he became co-President of the Directele Corporate Defendants with Gilstorf. At all times material to this Complaint, acting alone or in concert with others, Lia formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ACS and the Directele Corporate Defendants, including the acts and practices set forth in this Complaint. Lia resides in this District. In connection with the matters alleged herein, he transacts or has transacted business in this District and throughout the United States.

*John Lucidi ("Lucidi")*

42.     Defendant John Lucidi served as a Senior Manager at ACS, where he worked for more than 20 years, until at least mid-2019. At all times material to this Complaint, acting alone or in concert with others, Lucidi formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices of the ACS Corporate Defendants, including the acts and practices set forth in this Complaint. Lucidi resides in this District. In connection with the matters alleged herein, he transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISES

### *ACS Corporate Defendants*

43.     The ACS Corporate Defendants operated as a common enterprise while engaging in the deceptive and unlawful acts and practices and other violations of law alleged below. They worked collectively to design, organize, manage, market, and derive revenue and profit from the deceptive fundraising scheme from at least 2008 through September 2019. The ACS Corporate Defendants conducted the business practices described below through an interrelated network of companies that had common ownership, officers, managers, employees, office locations, vendors, and clients. They have been partners in concerted wrongdoing, jointly pursing and benefitting from a shared

business and marketing scheme marked by interdependent business functions and economic interests.

44.     Among other things, the ACS Corporate Defendants contracted with the same nonprofit organizations and jointly shared responsibility for the fundraising operation. ACS initiated telemarketing calls, CSA made direct mail appeals, and CPS supported the operations of both. For example, CPS employees designed, drafted, printed, and mailed the solicitation materials (pledge cards, thank you letters, brochures, and the like) to individuals who told ACS they would make a donation. CPS employees also designed, drafted, printed, and mailed direct mail charitable solicitations for CSA. CSA itself had no employees; it outsourced all of its work to Defendant CPS. The coordination among the ACS Corporate Defendants was intentional. As one senior manager noted, "The goal is to create a cohesive messaging strategy to donors, so that what they hear on the phone translates over to the materials."

45.     In addition, CPS provided processing services for the nonprofits for which ACS and CSA solicited (i.e., CPS opened mail containing donation checks and deposited the checks) and maintained an accounting of donations received on behalf of the nonprofits. CPS also provided comprehensive IT support to ACS's telemarketing operation. For example, CPS employees loaded leads (telephone numbers) into ACS auto-dialers, maintained those auto-dialers and their interface

with the live telemarketers and soundboard operators, and managed the information that appeared on donors' Caller ID screens when they received calls from ACS. CPS also employed compliance personnel that reviewed telemarketing scripts and direct mail pieces and communicated with nonprofits about those materials. Other CPS employees reviewed and responded to complaints about ACS's telemarketing.

46.     Because the ACS Corporate Defendants operated as a common enterprise, they are partners in concerted wrongdoing and are liable for the acts and practices alleged below. Defendants Cole, Barbara Cole, Burland, Amy Burland, Stepek, Gilstorf, Lia, and Lucidi formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices of one or more of the ACS Corporate Defendants that constitute the ACS common enterprise and each is a partner in the concerted wrongdoing of the common enterprise. Collectively ACS, CPS, CSA, Cole, Barbara Cole, Burland, Amy Burland, Stepek, Gilstorf, Lia, and Lucidi are referred to as the "ACS Defendants."

### *Directele Corporate Defendants*

47.     The Directele Corporate Defendants have also operated as a common enterprise. The corporations share common ownership, officers, managers, employees, office locations, vendors, and clients. They are partners in concerted

wrongdoing, jointly pursing and benefitting from a shared business and marketing scheme marked by interdependent business functions and economic interests.

48.     Directele initiates fundraising calls while Dale Corp. employees print and mail the solicitation materials sent to individuals who tell Directele that they will make a donation. Dale Corp. also provides Directele's nonprofits with donation processing services and maintains an accounting of donations received on behalf of those nonprofits.

49.     Because the Directele Corporate Defendants have operated as a common enterprise, they are partners in concerted wrongdoing and are liable for the acts and practices alleged below. At times material to this Complaint, Defendants Cole, Burland, Gilstorf, and Lia have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of one or more of the Directele Corporate Defendants that constitute the common enterprise and each is a partner in the concerted wrongdoing of the common enterprise. Collectively, Directele, Dale Corp., Cole, Burland, Gilstorf, and Lia are referred to as the "Directele Defendants."

50.     The ACS Defendants and the Directele Defendants are collectively referred to as the "Defendants."

## COMMERCE

51.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

52.     Through nationwide fundraising calls and direct mail solicitations, the ACS Defendants made deceptive claims to donors about numerous nonprofit organizations. Many of these nonprofits were small organizations with little to no expertise in fundraising. These organizations did little more than collect their small percentage of the donations the ACS Defendants procured and otherwise ceded practically all control of fundraising to the ACS Defendants. The ACS Defendants stopped fundraising in September 2019.

53.     The Directele Defendants are continuing the charitable solicitation scheme originated by the ACS Defendants. In 2018, Cole and Burland started grooming the Directele Corporate Defendants as successors to their fundraising operation. Among other things, Burland and Cole caused CSA to provide more than $170,000 in financial support to the then-financially-struggling Directele Corporate Defendants. In May 2018, Cole and Burland entered into an agreement that provided them the option to purchase two-thirds of the Directele Corporate Defendants. Separately, Burland and Cole contracted with the Directele Corporate

Defendants to serve as consultants about "all aspects of the fundraising business." With those connections, Directele started contracting with the same nonprofit organizations as ACS, on substantially similar terms.

54.     By November 2018, Burland and Cole installed Gilstorf at the Directele Corporate Defendants as COO, even though she remained on the payroll of the ACS Corporate Defendants. Directele then hired several former ACS managers and telemarketers and began expanding its telemarketing to additional states. Because at that time Dale Corp. could not handle the increased processing volume from the solicitations for new nonprofits in new states, Directele hired CPS to process its pledge mailings and donations. After CPS closed, Dale Corp. resumed its back-end support of Directele's telemarketing—with the assistance of several newly hired employees who had performed the same tasks when they worked for CPS.

### *The Nonprofit Organizations*

55.     Between 2008 and 2015, the ACS Defendants solicited for numerous nonprofit organizations, including three organizations purporting to assist cancer patients, Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society. Monetary claims against ACS related to its solicitations for these groups were excepted from its bankruptcy discharge. Since at least 2016, the ACS Defendants solicited for several nonprofit organizations that purported to assist cancer patients,

as well as other health-related organizations, veterans' organizations, and organizations associated with first responders. Often, the names of the organizations sound alike and the programs described to donors were very similar.

56.     Nonprofits for which the ACS Defendants solicited that they claimed assisted cancer patients included:

     a.     American Children's Cancer Foundation, Inc. (solicitations from prior to 2016 to September 2019);

     b.     Breast Cancer Charities of America, Inc. (solicitations from prior to 2016 to September 2019);

     c.     The Breast Cancer Society, Inc. (solicitations from 2008 to May 2015);

     d.     Cancer Fund of America, Inc. (solicitations from prior to 2008 to May 2015);

     e.     Cancer Recovery Foundation International, Inc. dba Women's Cancer Fund (solicitations from prior to 2016 to September 2019);

     f.     Children's Cancer Fund of America, Inc. (solicitations from prior to 2008 to May 2015);

     g.     Children's Cancer Recovery Foundation, Inc. (solicitations from prior to 2016 to January 2018);

h.  Children's Leukemia Research Association, Inc. (solicitations from prior to 2016 to 2018);

i.  United Breast Cancer Foundation, Inc. (solicitations from prior to 2016 to September 2019); and

j.  United Cancer Support Foundation, Inc., also dba American Breast Cancer Support Association (solicitations from prior to 2016 to September 2019).

57.  The ACS Defendants also solicited for other nonprofits that they claimed would assist individuals with various health-related issues. These included:

a.  Autism Spectrum Disorder Foundation, Inc., dba Autistic Children of America (solicitations from prior to 2016 to September 2019);

b.  Kids Wish Network, Inc. (solicitations from 2018 to September 2019); and

c.  The Organ Donation and Transplant Association of America, Inc. ("Organ Donation and Transplant Association") (solicitations from prior to 2016 to September 2019).

58.  In addition, the ACS Defendants solicited for nonprofits that they claimed were dedicated to assisting veterans, firefighters, and other first responders. These included:

a.      Firefighters Charitable Foundation, Inc. (solicitations from prior to 2016 to September 2019);

b.      Firefighters Support Services, Inc. (solicitations from prior to January 2016 to August 2016);

c.      Foundation for American Veterans, Inc. (solicitations from prior to 2016 to July 2017);

d.      Homes for Veterans, A NJ Non Profit Corporation ("Homes for Veterans") (solicitations from 2018 to September 2019);

e.      Law Enforcement Education Program, Inc. (solicitations from prior to 2016 to 2018);

f.      Veterans Support Foundation, also dba United States Armed Forces Association (solicitations from prior to 2016 to September 2019); and

g.      Volunteer Firefighter Alliance, Inc. (solicitations from 2018 to September 2019).

59.    The Directele Corporate Defendants began soliciting throughout the country for several of the same nonprofit organizations as ACS in 2018. Solicitations for several continue to the present. Nonprofits for which the Directele Corporate Defendants have solicited include:

a.      Autism Spectrum Disorder Foundation, Inc., also dba Autistic Children of America;

b.  Breast Cancer Charities of America, Inc.;

c.  Cancer Recovery Foundation International, Inc., dba Women's

Cancer Fund (contract terminated November 1, 2019);

d.  Firefighters Charitable Foundation, Inc.;

e.  Homes for Veterans;

f.  Kids Wish Network, Inc.;

g.  United Breast Cancer Foundation, Inc.;

h.  United Cancer Support Foundation, Inc., also dba American

Breast Cancer Support Association (contract terminated December 16,

2019); and

i.  Veterans Support Foundation, also dba United States Armed

Forces Association.

### *The Fundraising Business*

60.  Since at least 2008, ACS primarily solicited donations via

telemarketing. ACS began using a combination of soundboard technology and live

telemarketers to communicate with donors in 2011. By 2016, live telemarketing

calls represented less than 10 percent of ACS's calls, and were originated by a

small group of telemarketers located in a satellite phone room in Dearborn,

Michigan. In October 2017, ACS transitioned to using soundboard technology for

all of its charitable solicitation calls. ACS's soundboard calls originated from

ACS's offices in Southfield, Michigan and a phone room in the Philippines. At least until October 15, 2019, when Directele was purchased by Gilstorf, Directele used only live telemarketers (several of whom previously worked the phones for ACS) to solicit donations. Directele began using soundboard technology to make fundraising calls from phone rooms in the Philippines and India in 2020.

61.     ACS and Directele both contracted with a vendor that caused Caller ID information on the telephone screens of individuals they called to display a number from an area code local to the individual call recipient and an abbreviation or short form of the nonprofit's name (i.e., "Volunteer Fire" for Volunteer Firefighters Alliance or "Breast Cancer" for United Breast Cancer Foundation). In fact, except for calls into Michigan, these fundraising calls were not from a fundraiser local to the individual call recipient. Nor, in most instances, were the calls from nonprofits local to the call recipient. ACS and Directele paid for this Caller ID service because people are more likely to answer when Caller ID displays local area codes rather than out-of-state or toll free numbers.

62.     From 2013 when ACS first contracted for this service through 2019, ACS used more than 6,000 different telephone numbers. It had to use so many different numbers because many individuals reported the numbers appearing in their Caller ID screens as related to "scams" or "robocalls." Those numbers would

then be blacklisted or otherwise susceptible to blocking by telephone carriers. So that its calls would continue to reach donors, ACS replaced numbers often.

63.    ACS and CPS employees wrote the fundraising scripts ACS used to solicit donors. They also wrote and recorded the audio clips ACS played to donors during soundboard calls. These employees reviewed information about the nonprofits, including financial information, when drafting scripts and text for audio clips. As discussed further below, they knew that in many instances the nonprofits spent negligible amounts (if anything) on the programs described to donors. Directele and Dale Corp. employees drafted scripts and direct mail materials Directele used to solicit contributions.

64.    ACS used different scripts for different types of calls, including versions for cold calls to individuals who had not contributed previously to any ACS nonprofit, calls to donors who had contributed previously to a different ACS nonprofit, calls to former donors who had previously contributed to that particular nonprofit, and calls to individuals who had pledged to contribute but not yet returned a donation. Directele also had different scripts for different types of calls. In addition to these tailored presentations, all scripts at both ACS and Directele included "FAQs" that provided responses or prerecorded audio clips to questions frequently asked by donors.

65.     Nonprofits for which ACS and Directele solicited signed a form approving the wording of some of the live telemarketing scripts and prerecorded audio clips used to solicit donations. In numerous instances, in both "live" and soundboard telemarketing calls, ACS employees used unapproved scripts to solicit donations. As detailed below, whether approved by the nonprofit or not, the telemarketing scripts and prerecorded audio clips written and recorded by ACS and CPS employees and used by ACS telemarketers and soundboard operators to solicit charitable contributions contained false or misleading representations. Telemarketing scripts and/or prerecorded audio clips used to solicit contributions by Directele, many of which were substantially similar to those used by ACS, also contained false or misleading representations.

66.     During an ACS telemarketing call, after an individual agreed to donate the telemarketer transferred the call to a verifier. Until late 2017 or early 2018, verification calls were handled "live" by individuals who communicated one-on-one with donors. After that, ACS switched to using soundboard technology to verify its "sales." The soundboard operators typically verified sales on two of their three headsets and handled outbound solicitation calls on the third because it proved too difficult for verifiers to enter credit card information using their "middle" hand. ACS trained verifiers to seek to obtain payment via credit card or

ACH debit, but many donors pledged to mail their donations. Directele also employs separate personnel to verify "sales."

67.     Donations contributed via credit card were deposited into a merchant account in the name of the nonprofit organization. In numerous instances, ACS and/or CPS had access to these merchant accounts.

68.     CPS sent donors who agreed to contribute via check a pledge card and a brochure, thank you letter, or other printed solicitation materials about the nonprofit. Individuals who did not remit donations promptly were sent "dunners"—collection letters reminding them of the supposed good works their donations would support and their pledges to donate. Dale Corp. sends pledge cards on behalf of Directele.

69.     CPS drafted and designed the printed solicitation materials used by the ACS Corporate Defendants. When drafting these printed materials, CPS employees reviewed information about and from the nonprofits, including websites and the nonprofits' tax returns, known as Form 990s. As described further below, they knew that, in many instances, the nonprofits spent only negligible amounts (if anything) on the programs described to donors. In most instances, nonprofit executives signed forms approving these materials. As with the scripts, and as described further below, whether approved by the nonprofit or not, the printed solicitation materials written, designed, and mailed to donors by CPS contained

false or misleading representations. Printed solicitation materials sent by Dale Corp. to donors, which are often substantially similar to those used by CPS, also contain false or misleading representations.

70. Donors returned their pledged donations to various addresses throughout the Detroit, Michigan area. CPS collected and opened this mail, deposited donations in accounts held in the names of the nonprofits, and provided an accounting of the deposits to the nonprofits. This process is known as "caging" in the fundraising industry. Dale Corp. performs the same function for Directele.

71. Based on the accounting of collections provided by CPS, the nonprofits then paid ACS and CPS (and when applicable CSA) their contractually due percentage of the donations. In numerous instances, nonprofits provided CPS employees with signed blank checks drawn on the accounts where donations were deposited so that CPS could pay itself and ACS. The process is similar at Directele and Dale Corp.

72. Several ACS nonprofits also contracted with CSA to send direct mail solicitations to donors. CPS employees drafted and designed these direct mail solicitations and mailed them. Typically, they sent these direct mail solicitations to individuals who had previously donated to that nonprofit through ACS. By mailing solicitations only to prior donors solicited by ACS, CSA avoided paying for additional lists of fundraising "leads" (names and addresses of likely donors). CPS

processed donations returned in response to CSA's direct mail solicitations in the same way that it processed donations returned in response to calls by ACS. The CSA direct mail solicitations contained similar false or misleading representations.

### *Contracts Hide Fundraising Costs*

73.     The deceptive fundraising scheme began with the contracts between the nonprofits and the ACS Corporate Defendants. On some occasions, ACS contracts called for the nonprofit to pay ACS 80 to 90 percent of the funds raised. In other instances, ACS contracts called for the nonprofit to pay ACS 55 to 60 percent of the funds raised and required the nonprofit to separately contract with CPS to provide caging and mailing services related to donations solicited by ACS. In those instances, the CPS contracts required the nonprofit to pay it 25 to 30 percent of donations. Regardless of the contractual structure, in most instances the total amount paid by the nonprofits to the ACS Corporate Defendants remained 80 to 90 percent. The Directele contracts typically also require nonprofits to pay 80 to 90 percent of the funds raised.

74.     The use of separate ACS and CPS contracts allowed both ACS and the nonprofits to tell donors and regulators, deceptively, that more of each donation went to the nonprofit. In those instances, ACS fundraising reports submitted to state charity regulators reflected that the nonprofit kept 45 percent or more of each donation. In reality, the nonprofit paid additional fundraising expenses to CPS of at

least 25 to 30 percent. In numerous instances, nonprofits deceptively reported only the 55 to 60 percent payments to ACS as "fundraising expenses" to the IRS and state charity regulators. This contract scheme allowed both ACS and the nonprofits to hide the true cost of fundraising from the public and government agencies.

75.     In addition to its guaranteed percentage-based compensation, ACS contracts typically provided that ACS would own or share ownership of the list of individuals who donated in response to ACS solicitations (the "donor list"). Because it owned the donor lists, ACS freely contacted donors to one nonprofit on behalf of other nonprofits. Use of the same donor list across multiple nonprofits reduced the cost to ACS of developing lead lists. The nonprofits, however, typically did not benefit from the reduced costs of calling prior donors solicited by ACS. Indeed, even in many of the ACS contracts where the nonprofit shared ownership of the donor list, the nonprofit was restricted from contacting those donors for two years following the end of the contract. Typically, Directele contracts also provide that Directele owns or shares ownership of the donor list.

76.     CSA also obfuscated the rates paid to it by nonprofits. CSA's contracts typically included a provision that the nonprofit would pay CSA per piece of mail delivered by CSA on the nonprofit's behalf. In numerous instances, however, CSA was simply paid 85 percent of the donations generated by the direct mail solicitation campaign rather than the "per piece" rate specified in the contract.

This is an important distinction because accounting rules prohibit nonprofits from describing some of the costs of fundraising as educational program expenses when the fundraiser is paid on a percentage basis.

### *Defendants Have Engaged in Deceptive Charitable Solicitations*

77.     Both the ACS Defendants and the Directele Defendants have made false or misleading claims to donors while soliciting charitable contributions. In some instances, Defendants' claims are outright lies because the nonprofit spends no money at all on the described program. In other instances, the nonprofit spends such a small amount on the described program—in most instances five percent or less of donations—that it is misleading and deceptive to tell donors that their contributions would be spent on that program. Such deception is fundamental to the Defendants' business model because people are exceptionally unlikely to donate to nonprofits knowing that they spend only incidental amounts on charitable programs.

78.     Deceptive claims about the specific charitable programs that donations will support pervaded the ACS Defendants' solicitations for years, and continue to infect solicitations by the Directele Defendants. The Defendants have buttressed the central deception about donations supporting charitable programs with false or misleading claims about the importance or urgency of donations and the geographic locations that benefit or potentially benefit from donations.

79.     As further described below, Defendants' deceptive practices violate federal and state law. Section 5 of the FTC Act and individual laws of the Plaintiff States prohibit false or misleading representations or omissions of material fact by for-profit fundraisers soliciting charitable donations. The Telemarketing Sales Rule similarly prohibits telemarketers from making false or misleading statements to induce charitable contributions, 16 C.F.R. § 310.3(a)(4). The TSR further prohibits any telemarketer soliciting charitable contributions from misrepresenting, directly or by implication, "the nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested"; and "the purpose for which any charitable contribution will be used." 16 C.F.R. § 310.3(d)(1) and (3).

### *Misrepresentations about Charitable Programs Benefitted by Donations*

#### *False or Misleading Claims that Donations Assist Cancer Patients*

80.     Defendants have solicited for numerous nonprofit organizations that claim to support cancer patients. In these solicitations, Defendants have made a variety of claims about how these nonprofits will supposedly spend donors' contributions to help cancer patients.

#### *False or Misleading Promises to Provide Financial Assistance to Cancer Patients*

81.     Among the most common false or misleading claims about cancer-related nonprofits made by both the ACS and Directele Defendants have been representations that the nonprofits would provide financial assistance to suffering

cancer patients or, when soliciting for children with cancer, to the families of suffering children. The ACS Defendants made these claims in solicitations for American Children's Cancer Foundation, Cancer Fund, Children's Cancer Fund, Children's Cancer Recovery Foundation, Children's Leukemia Research Association, and The Breast Cancer Society. Both ACS and Directele Defendants have made these claims in solicitations for Breast Cancer Charities of America, Cancer Recovery Foundation International dba Women's Cancer Fund, and United Breast Cancer Foundation.

82.     The claims of financial support often have been very specific. For example, for some nonprofits Defendants have claimed that donations would be used to pay rent or past due utility bills. For instance, a pledge mailer for American Children's Cancer Foundation (written and mailed to donors by CPS) stated:

> If it's at all possible, I'm asking you to fulfill your pledge quickly. No, today please because a family is going to have their lights turned off if we don't intervene, a family has until the end of the week to catch up on the rent or they'll be evicted, a little girl with cancer needs new shoes, socks, T-shirts and pajamas because what she's wearing now is old, worn and makes her feel terrible. You know John, it would be troubling enough to think you may be without heat, lights or even a roof over your head. But going through such trouble while caring for a son or daughter with cancer, well, that would almost be unbearable wouldn't it?

A postscript to that mailer noted that "Your pledge heralds lasting hope and immediate help."

83.     Similarly, a pledge mailer for Cancer Recovery Foundation International dba Women's Cancer Fund used in connection with solicitations by both the ACS and Directele Defendants, echoing claims in the telemarketing scripts, represented, "Your generosity helps pay for patients' past-due rents and past-due utility bills." Claims that donations would be spent helping cancer patients with rent and utility payments were frequent; the ACS Defendants also made such representations in solicitations for The Breast Cancer Society and Children's Cancer Recovery Foundation, and both the ACS and Directele Defendants made such representations about donations to Breast Cancer Charities of America and United Breast Cancer Foundation.

84.     In other instances, Defendants have represented simply that donations will be spent providing financial assistance or direct financial support to cancer patients or their families. For example, ACS telemarketers soliciting for Cancer Fund told donors, "We're back to work . . . Helping cancer patients financially because most insurance payments, including Medicare and Medicaid, fall short of the money needed to cover the cost of basic needs during cancer care."

85.     Similarly, ACS telemarketers told donors to Children's Cancer Fund and Children's Leukemia Research Association that their contributions would be used to provide "direct financial aid" or "direct financial assistance" to families of suffering children, and both ACS and Directele telemarketers have told donors that

contributions to United Breast Cancer Foundation would be used for its "individual grant program."

86.     In fact, each of the nonprofits about which the Defendants have made these claims spent less than five percent of donors' contributions on financial aid to individual cancer patients or their families.

87.     Often, the amount dedicated to financially helping individual cancer patients was far less than five percent of donors' contributions. Cancer Recovery Foundation International dba Women's Cancer Fund, for example, in 2017 reported total contributions of $13,986,214 and spent just one tenth of one percent of that amount— $17,485—helping 70 women with cancer by paying past-due rent and utilities. The claim that donations would be used for this purpose was, however, the major focus of solicitations by the ACS Defendants and remains the focus of the Directele Defendants. The ACS Defendants were aware of the organization's limited spending on rent and utilities; in an email to Defendant Stepek, the ACS compliance officer characterized the amount spent on this program by Cancer Recovery Foundation International as "very modest" and warned "[w]e can't overstate the aid."

88.     Similarly, although the ACS Defendants represented to donors that Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society helped cancer patients financially, the organizations spent almost no money doing so.

From 2008–2012 (the period that records reflecting this are available), Cancer Fund spent just 0.1 percent of cash donations providing such aid, Children's Cancer Fund spent just 3.4 percent of cash donations providing such aid, and The Breast Cancer Society spent just 2.2 percent of cash donations providing such aid.

89.     Under these circumstances, Defendants made false or misleading claims to donors that their contributions would be used to provide financial support to cancer patients.

*False or Misleading Promises to Provide Screenings to Prevent or Detect Cancer*

90.     Defendants also have made false or misleading claims that donors' contributions would be spent helping prevent or detect cancer by providing free or low cost cancer screenings. Both ACS and Directele Defendants have made these claims in solicitations for United Breast Cancer Foundation and United Cancer Support Foundation. Directele also makes these claims in solicitations for United Cancer Support Foundation dba American Breast Cancer Association.

91.     Typical representations include this statement in a prerecorded audio clip played to donors by ACS soundboard operators soliciting for United Cancer Support Foundation: "Currently, we are helping the at-risk and uninsured ladies with free mammograms to help stop cancer in its tracks, and we couldn't do it without you."

92.     A direct mail solicitation by CSA for United Cancer Support Foundation elaborated on the claim: "Your support makes it possible to provide free mammograms to at-risk, homeless, low income, and vulnerable populations, as well as free FIT (Fecal Immunochemical Test) Kits for colorectal cancer screening . . . ."

93.     Donors who pledged to contribute to United Breast Cancer Foundation were told by the ACS Defendants, "many women at risk for breast cancer are under-insured or have no health insurance at all and never receive the medical care they deserve. UBCF offers free or low cost breast screenings and follow-up care. We cover all forms of screening technology."

94.     In addition, the Directele Defendants, while soliciting for United Cancer Support Foundation dba American Breast Cancer Support Association in 2019, told donors in a pledge mailer, "With your support, you enable us to continue our free mammograms to at risk, low income, uninsured populations."

95.     In fact, neither United Breast Cancer Foundation nor United Cancer Support Foundation spends more than an insignificant amount of donors' contributions providing mammograms or other cancer screenings to anyone. Indeed, in its 2018 Form 990, United Breast Cancer Foundation reported spending $121,369 of the more than $24 million in contributions, or less than one-half of one percent of donations, on breast screening services. In its 2018 audited

Financial Statement, United Cancer Support Foundation reported spending $67,783 on "cancer detection;" 2.7 percent of the $2,502,351 it received in contributions. Under these circumstances, Defendants made false or misleading claims to donors that their contributions would be used to provide cancer screenings.

### *False Promises to Provide Pain Medicine to Cancer Patients*

96.    In telemarketing calls on behalf of numerous nonprofits, the ACS Defendants routinely told the outright lie that donations would be used to provide pain medicine to alleviate the suffering of cancer patients in the United States. The ACS Defendants made these false claims in fundraising calls on behalf of Cancer Fund, Children's Cancer Fund, The Breast Cancer Society, Breast Cancer Charities of America, and United Breast Cancer Foundation.

97.    For example, when soliciting on behalf of Children's Cancer Fund, ACS telemarketers told donors: "We [Children's Cancer Fund of America] are working to . . . provide pain medication, medical supplies and hospice care when families cannot afford them to battle cancer with no financial worries." ACS telemarketers told donors to Cancer Fund things like, "and the Cancer Fund of America will use gifts like yours to assist patients with pain medication [and] hospice support . . . ."

98.     Prerecorded audio clips played to donors by ACS soundboard operators for Breast Cancer Charities of America stated, "This is Sam; it is just a quick call back to say 'thank you' on behalf of the Breast Cancer Charities of America. Just wanted to let you know that with your past support we were able to help our women that are fighting breast cancer with pain medication and financial support." Similarly, for United Breast Cancer Foundation, one audio clip played by ACS to donors explained that "[t]hey help with things like . . . pain medication. . . ." An audio clip for The Breast Cancer Society stated, "We're a professional fundraiser calling on behalf of The Breast Cancer Society which gives direct aid to patients fighting this horrible disease by paying for things like pain medication . . . ."

99.     While heart-wrenching, the claims made by the ACS Defendants were completely false. Not one of these nonprofits provided pain medication to cancer victims or otherwise assisted people in the United States to obtain pain medication that would alleviate their suffering. Under these circumstances, the ACS Defendants made false claims to donors that their contributions would be used to provide pain medication to cancer patients.

*Other False or Misleading Claims about Donations to Cancer-related Programs*

100.    Defendants have made additional false or misleading claims about programs that contributions to cancer-related charities would ostensibly support.

Claims have included deceptive representations that donations would be used to fund cancer research (by the ACS Defendants for United Breast Cancer Foundation and by both the ACS and Directele Defendants for United Cancer Support Foundation), or to pay for hospice care (by the ACS Defendants for Cancer Fund and Children's Cancer Fund), breast reconstruction (by the ACS Defendants for United Breast Cancer Foundation), college scholarships (by the ACS Defendants for United Breast Cancer Foundation and by both the ACS and Directele Defendants for Breast Cancer Charities of America), chemotherapy (by the ACS Defendants for Cancer Fund, Children's Cancer Fund, Children's Leukemia Research Association, and The Breast Cancer Society), special outings and events (by the ACS Defendants for American Children's Cancer Foundation), and special gifts for cancer patients (by the ACS Defendants for American Children's Cancer Foundation, Cancer Fund, and Children's Cancer Recovery Foundation and the Directele Defendants for United Cancer Support Foundation).

101.   In fact, the nonprofits about which Defendants made these claims spent at most an incidental amount of contributions on the specific programs described to donors. United Breast Cancer Foundation, for example, in 2018 reported spending less than two-tenths of one percent of its $24 million in donations, $42,151, helping 14 women with breast reconstruction. Some of the claims about these nonprofits, like promises that donations to Cancer Fund or

Children's Cancer Fund would be spent on chemotherapy or hospice care, were completely false—the nonprofits did not provide any such services. Under the circumstances, these claims were false or misleading and deceptive.

*Misleading Claims of Urgency and Importance Enhance Program Claims*

102.   Both the ACS and Directele Defendants routinely have made additional false claims about the urgency or importance of donations, especially when soliciting for nonprofits that purport to benefit individuals with cancer. In fact, although their needs were likely both urgent and important, suffering cancer patients did not meaningfully benefit from donations solicited by the Defendants, regardless of when or how the donation was made. Nonetheless, claims often emphasized the specific benefits that donations would supposedly accomplish. For example, this excerpt from a pledge mailer for Cancer Recovery Foundation International dba Women's Cancer Fund, written and sent by CPS to donors, stated: "Thank you so much for your gracious support. We applied your $20 donation to help a woman suffering not only from cancer, but also from a lack of income to pay her rent or utilities."

103.   ACS telemarketers were trained to use these claims of urgency and importance in rebuttal statements to overcome objections by reluctant donors. For example, ACS "live" telemarketers were provided rebuttal scripts for cancer-related organizations that directed them to make statements like, "[T]hese men and

women who are suffering with Breast Cancer rely on your donation to survive"

(The Breast Cancer Society); and "these cancer patients are choosing between

chemotherapy and putting food on the table. It doesn't take much to help" (generic

rebuttal for cancer nonprofits). ACS soundboard operators played donors similar

prerecorded audio clips, including, e.g., "$20 is a small price to pay to help save a

woman's life" (soundboard audio clip for United Breast Cancer Foundation).

Similarly, one Directele script for Kids Wish Network emphasized the importance

of quick action because "some of these kids that are terminally ill and may not live

to see another birthday/holiday season. That's why time is of the essence . . . ."

104.   Claims of urgency were also key features in reminder calls or

"dunning letters" sent to individuals who had not remitted promised pledges. For

example, a dunning letter sent by CPS for Cancer Recovery Foundation

International dba Women's Cancer Fund, stated, "One of the reasons I've sent out

this reminder so quickly is because time is always an issue with the women who

come to us for aid. . . . These women are desperate, sick, and in need of our help as

fast as we can give it. **No. Even faster!**" [emphasis in original]. Other letters

informed donors that their entire donations would be used for the stated purpose.

For example, a letter sent by CPS for Law Enforcement Education Program stated,

"Your donation of $20.00 will be used to help save the lives of children! I can't

think of a more productive or gratifying endeavor, and I bet you feel the same

way!" Despite these claims, at best only incidental amounts of these donations were used to help women with breast cancer or children.

105.   A pledge reminder sent by Directele for United Breast Cancer Foundation echoed this theme: "Your support is necessary and truly needed by men and women who are anxiously wondering how they're going to stay in their own homes to heal. That's why I'm writing you today—to remind you just how desperate these patients are and how critical your gift is."

106.   In every instance, the nonprofit receiving the donation allocated only minimal amounts (if any) to helping cancer patients as described. The Defendants were the only ones to receive immediate benefit from these donations.

*False or Misleading Claims that Donations Assist Veterans*

107.   Defendants have made false or misleading claims about veterans-related organizations as well. Misrepresentations have included claims that donations will be spent providing financial assistance to needy veterans and helping homeless or disabled veterans, and that the nonprofits operated programs nationwide. Such misrepresentations about charitable programs supported by donations have been made by the ACS Defendants about Foundation for American Veterans and Homes for Veterans, and by both ACS and Directele Defendants about Veterans Support Foundation also dba United States Armed Forces Association.

108.   The ACS Defendants deceptively claimed that donations to Foundation for American Veterans would be used to provide financial assistance to needy veterans. For example, one prerecorded audio clip played to donors by ACS soundboard operators stated: "The Foundation for American Veterans is a charity that provides financial assistance for Veterans of the United States Armed Forces. It's the least we could do for the sacrifices they have made for our country." This statement did not accurately represent how the organization spent donations. In 2016, for example, Foundation for American Veterans reported in its Form 990 that it received over $13.7 million in donations and it spent just eight-one-hundredths of one percent, $11,505, providing 15 veterans with direct financial assistance. In other words, for every $1,000 donated to Foundation for American Veterans, it spent 80 cents providing financial assistance to veterans. Under the circumstances, this claim about Foundation for American Veterans was false or misleading and deceptive.

109.   Both ACS and Directele Defendants have made false or misleading claims about how donations to Veterans Support Foundation also dba United States Armed Forces Association would be used to help veterans, including by providing housing to homeless veterans. Because Defendants have solicited for Veterans Support Foundation both in its own name and also in the name United States Armed Forces Association, they have been able to solicit the same donors multiple

times, making the same deceptive claims about contributions benefitting homeless

veterans. Claims about helping homeless veterans have included statements like

this prerecorded audio clip ACS soundboard operators used to solicit new donors:

"We are helping out the homeless veterans with housing and shelter to help them

get back on their feet," and this prerecorded audio clip ACS used to solicit renewal

donors: "Without your help, some of our American veterans may still be homeless,

and because of you, these heroes are getting off the streets . . . ." Both ACS and

Directele Defendants used this claim in telephone solicitations:

> I was just letting you know we are still helping to get our homeless
> veterans off the street. I am sure you will agree they were not
> homeless when they enlisted and they should never come home and
> live on the same streets of the same country they fought to protect, so
> we are just calling to make sure that our American heroes can count
> on your one-time donation . . . ."

110.   Despite this claim, Veterans Support Foundation has spent only an

incidental amount of donors' contributions helping to get homeless veterans off the

streets. Its only such program, paid for in large part by government grants and

payments by the veterans themselves, consists of four transitional houses in

Connecticut that can collectively house up to 30 veterans. At best, it appears from

its audited financial statements and Form 990s that Veterans Support Foundation

spent about 6 percent of the more than $13 million that donors contributed from

October 2015 through September 2018 on this program. It has no other program to

help house homeless veterans. It may occasionally have provided grants to other

nonprofits that do so, but any such spending was merely incidental to donors' contributions.

111. ACS and Directele Defendants have also specifically misrepresented the urgent need for donors to fund these Connecticut transitional houses. For example, one ACS pledge mailer claimed: "your support helps us maintain transitional homes for veterans who are, if not at the end of their rope, holding onto the last few inches of it. . . . Because we rely completely on the generosity of our friends to carry on this work of transforming veterans, could you match or exceed your last donation?"

112. The Directele Defendants made similar false claims in a pledge reminder: "Naturally, it takes money to keep these homes running. Your gifts help pay for upkeep and maintenance of these homes. They help pay for the incredibly selfless workers who are strapped to their beepers day and night, ready to meet the needs of a hurting hero."

113. The vast majority of donors' contributions to Veterans Support Foundation were not used to support the four Connecticut transitional houses. Under these circumstances, the claims made by both the ACS and Directele Defendants about this organization were false or misleading.

114. The ACS Defendants also made false or misleading claims about Homes for Veterans. In prerecorded audio clips played to donors, ACS claimed

that donations to Homes for Veterans would be spent helping disabled veterans to modify their homes to provide them with "access to their showers, kitchens, sinks, stuff we sometimes take for granted." These claims were echoed in written materials, including, a pledge card that stated:

> There are plenty of veterans who need our help; veterans like George and Robert who aren't asking for a mansion, just a kitchen or bathroom they can get around in. These heroes ask for the most modest of things. Because of our friends like you, together we will accommodate them.

115.   A pledge reminder written and sent by CPS to Homes for Veterans donors stressed that "[t]ime is always of the essence when a disabled vet can't bathe because it's simply too dangerous for him to get into the tub."

116.   In fact, in its 2018 Form 990, Homes for Veterans reported spending only $101,268 of the $1.68 million contributed to it—6.1 percent—to modify veterans' homes. Under these circumstances, the claims made by ACS about this organization were false or misleading.

### *False or Misleading Claims about Program Spending by Organizations Purporting to Assist Firefighters and Burn Victims*

117.   The ACS Defendants also made false or misleading claims about organizations purporting to assist firefighters and burn victims including Firefighters Support Services, Firefighters Charitable Foundation, and Volunteer Firefighter Alliance. Fundraising claims about these organizations were very similar. They included misrepresentations that donations would be spent providing

financial assistance to fire victims, including families or individuals burned out of their homes, and providing safety equipment to fire departments.

118. The ACS Defendants routinely claimed that donations to Firefighters Support Services and Firefighters Charitable Foundation would be used to assist fire victims. For example, one pledge reminder for Firefighters Charitable Foundation stated, "Remember that your gifts can be used to aid burn victims or provide food, shelter and funds to pay bills for people whose lives have been devastated due to a fire or other terrible disaster." Similarly, a representative ACS script for Firefighters Support Services claimed that donations would be used "helping families that have been burned out of their homes by providing them with financial support."

119. Neither Firefighters Support Services nor Firefighters Charitable Foundation spent more than an incidental amount of donors' contributions helping fire victims. Indeed, for its fiscal year ending June 30, 2015, Firefighters Support Services reported spending just $41,086 of $2,052,390 in contributions providing "aid to burn victims by donating amount to a burn charity" and "direct aid to two individuals who suffered losses from fire." In 2016 and 2017, Firefighters Charitable Foundation reported spending less than one percent of total contributions to provide direct financial support to individuals.

120.   The ACS Defendants also represented that donations to all three organizations would fund the purchase of safety equipment for firefighters. For example, a 2018 pledge mailer for Volunteer Firefighter Alliance stated, "[o]ne of the main focuses of our organization is to assist in raising funds for new equipment for fire stations." On behalf of Firefighters Support Services, ACS telemarketers claimed, "[w]e are back to work helping the guys at the fire houses get better equipment to keep them safe out there . . .," and in prerecorded audio clips played to donors ACS claimed that Firefighters Charitable Foundation was "providing volunteer fire departments with equipment and supplies."

121.   Not one of these organizations spent more than an incidental amount providing equipment to fire stations. For example, in its 2018 Form 990 Volunteer Firefighter Alliance reported spending **none** of the $4,567,842 donated to it helping fire stations obtain equipment, and Firefighters Charitable Foundation reported spending just 3.5 percent ($259,158) of the more than $7.3 million it received in donations providing equipment to fire stations in 2017. Under these circumstances, these claims made by ACS were false or misleading.

122.   The ACS Defendants also claimed that donations to Volunteer Firefighter Alliance would be spent providing firefighters with a line of duty death benefit. These claims, too, were false or misleading because the organization has

spent only an incidental amount of donations procuring an insurance policy for a

limited pool of members that might, in the future, be provided as death benefits.

### *False or Misleading Claims about Program Spending by Organ Donation and Transplant Association, Law Enforcement Education Program, Kids Wish Network, and Autism Spectrum Disorder Foundation*

123.   Both the ACS and Directele Defendants also have made false or

misleading claims about the supposed charitable programs that donors'

contributions to other nonprofit organizations would support. The ACS Defendants

made such deceptive claims about Organ Donation and Transplant Association and

Law Enforcement Education Program. Both ACS and Directele Defendants have

made such deceptive claims about Kids Wish Network and Autism Spectrum

Disorder Foundation also dba Autistic Children of America.

124.   For Organ Donation and Transplant Association, the ACS Defendants

told individuals that their contributions could help educate others about organ

donation. In numerous instances, solicitations also represented that contributions

would directly benefit transplant patients. For example, prerecorded audio clips

stated that contributions would "help these patients" or say "[we] wanted to make

sure these patients can count on your support" or "whatever you can spare to help

the patients in need at this time."

125.   Organ Donation and Transplant Association, however, did not spend

any money at all supporting or helping transplant patients. There were no patients

who would "count on" support from contributions and no "patients in need" who benefitted from contributions. Moreover, the "education" that Organ Donation and Transplant Association engaged in consisted of a pamphlet on organ donation mailed by CPS to contributors along with the pledge cards. Individual contributors were not paying to educate "others" about organ donation, they were paying to educate themselves—whether they needed or wanted the education. Of course, they were paying for the Organ Donation and Transplant Association's administrative, management and fundraising costs too. The claims made by the ACS Defendants about this organization were false or misleading.

126.    The ACS Defendants also made false or misleading claims about the Law Enforcement Education Program. The ACS Defendants told donors nationwide that contributions to this organization would support child safety and education programs. In fact, for fiscal years July 2015 through June 2018, the organization spent less than three percent of the more than $4 million donated on such programs. The ACS Defendants also told donors that contributions to this organization would be used to provide scholarships to young adults interested in becoming police officers. For fiscal years July 2015 through June 2018, however, the organization awarded only an incidental amount—a little more than three percent of donations—on scholarships to individuals. The claims made by the ACS Defendants about this organization were false or misleading.

127.   While soliciting for Kids Wish Network, the ACS and Directele Defendants have focused their solicitations on claims that donors' contributions would be spent granting the wishes of terminally ill children. For example, in prerecorded audio clips the ACS Defendants told donors that contributions would "help grant wishes for children facing life-threatening illnesses. Sadly, this could be the last happy memory their families have to remember them by."

128.   The Directele Defendants made similar claims. For example, a pledge mailer stated, "[f]ew of us can imagine the heartbreak of facing the loss of a child to a terminal illness. It is the promise of the Kids Wish Network to fulfill and touch these children's hearts. . . . Whether it is a trip to Disney, or a visit from a favorite celebrity, we want their wish to come true."

129.   In fact, Kids Wish Network spent only an incidental amount of donors' contributions on wish granting. For 2018, it reported in its Form 990 that it spent less than 3.5 percent of the total contributions it received providing wishes to children. From 2016 through 2018, it reported in its Form 990s that it spent just 4.7 percent of the more than $43 million it received in contributions providing wishes. Under these circumstances, the claims made by both the ACS and Directele Defendants about this organization were false or misleading.

130.   The Defendants made similarly misleading claims about the activities supported by donations to Autism Spectrum Disorder Foundation also dba Autistic

Children of America. For example, prerecorded audio clips played to donors by ACS described Autistic Children of America as "a charity that focuses on helping children with autism; providing scholarships and therapy to help them cope socially." ACS provided its live telemarketers with scripts that claimed that donations would be spent providing financial assistance to the families of children with autism. Scripts used by Directele telemarketers made similar statements, as did written pledge materials sent to donors by both the ACS and Directele Defendants.

131.   Autism Spectrum Disorder Foundation, however, has spent only an incidental amount of the millions of dollars donated to it on the programs described to donors, helping just a few hundred children. Indeed, according to its 2017 and 2018 Form 990s, it spent more money paying its Executive Director than it did helping children with autism. The claims made by both the ACS and Directele Defendants about this organization were false or misleading.

*False Claims about the Geographic Locations that Benefit from Donations*

132.   In numerous instances, the Defendants have made false or misleading representations about the geographic location(s) that benefit from the incidental program spending by nonprofit organizations. Prerecorded FAQ audio clips provided by ACS to soundboard operators, and scripted FAQ answers provided by Directele to its live telemarketers, to use when responding to "Does this support

my local area?" routinely claimed that the program was national in scope, and that

support "could" go to help women/children/firefighters/veterans in the donor's

neighborhood. Given the millions of people called by ACS and Directele in more

than 40 states, and that the nonprofits for which they were soliciting spent so very

little on the programs described to donors, it was extraordinarily unlikely that

contributions in fact benefitted the donor's local area, and thus the statements were

false or misleading.

133. Describing these nonprofits and their programs as "national" in scope

also falsely inflated the size and significance of the benefits provided. For

example, an ACS audio clip for Cancer Recovery Foundation International dba

Women's Cancer Fund stated, "Since it is a national program, it still helps all the

women, so it could help women in your neighborhood." A similar FAQ response

by Directele stated, "This could go to help the women in your area, but it is a

national organization just because we have ladies everywhere battling cancer, so

we are trying to help as many of them as we can." The "national program"

described to donors, helping women with cancer pay past due rent and utilities,

helped just 70 women in 2017.

134. Representations about the geographic locations that could benefit

from donations to Veterans Support Foundation were particularly misleading.

When asked, "Does this support my local area?" about the help to homeless

veterans that Veterans Support Foundation supposedly provided, ACS soundboard operators played audio clips that stated Veterans Support Foundation was a "national charity because the veterans who fought for us are in every state." A later-recorded audio clip responded to the same question, "The good news is this could help in your neighborhood, city, state, or anywhere across the country. Just because it is a national organization does not mean it will not help in your area." Directele's telemarketing scripts make similar representations about the national scope of the aid to homeless veterans provided by Veterans Support Foundation.

135.   In fact, Veterans Support Foundation operates only one program that helps homeless veterans, its transitional housing program in Connecticut. Moreover, it does not operate any programs "nationwide." For most donors that ACS called there was little chance that a contribution would assist homeless veterans in their neighborhoods, and thus the statements were false or misleading.

136.   Claims about the "national" scope of several other nonprofits were also deceptive. For example, ACS represented, in numerous instances, that donations to Homes for Veterans would support projects nationwide, when almost all of the limited work that Homes for Veterans did was in New Jersey. Similarly, ACS told donors that contributions to United Cancer Support Foundation, also dba American Breast Cancer Support Association, would be spent on a national basis. For example, this ACS audio clip states, "This is a national charity, and we are just

trying to help women who are fighting cancer from all over the nation." The majority of the organization's extremely limited spending, however, is in Tennessee.

### *Defendants Knew that their Solicitations Were Deceptive*

137. The ACS and Directele Corporate Defendants had actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that their charitable solicitations were false or misleading and, therefore, were deceptive. They knew this because, among other things, they asked for and reviewed financial information about the nonprofits for which they solicited that showed the organizations did not spend more than an incidental amount of contributions operating the charitable programs described to donors. The ACS Corporate Defendants also ignored red flags about the nonprofits' conduct raised by inquiries from charity regulators and journalists' investigative reporting about specific nonprofits. In addition, the ACS Corporate Defendants were knowledgeable about deceptive charitable fundraising because of their own prior experiences with state enforcement actions. (*See* Appendix A.)

### *Nonprofits' Financial Information Revealed Only Incidental Spending on Programs Described to Donors*

138. The ACS Corporate Defendants routinely obtained and reviewed nonprofit tax returns (Form 990s) and audited financial statements at the beginning of the relationship with a nonprofit and annually thereafter. It was the ACS

Corporate Defendants' policy to send nonprofits, quarterly, a request for a "Client Profile Update." The "Client Profile Update" form sought, among other things, information on the nonprofits' past revenues and their program spending on each program that the ACS Corporate Defendants described to donors, as well as information about anticipated changes in programs or program spending. When the ACS Corporate Defendants received financial documents and information, including responses to these "Client Profile Update" requests, they learned about the extraordinarily limited amounts the nonprofits spent on the supposed "programs" they described to donors.

139.   For example, Children's Cancer Recovery Foundation responded to a February 2017 request for information on its revenues and program spending with information that demonstrated the organization spent only incidental amounts— one percent or less of contributions for some programs—on the programs described to donors.

140.   Similarly, in June 2017, United Breast Cancer Foundation provided compliance staff with a copy of its 2016 Financial Statement in lieu of a specific response to the "Client Profile Update." That document listed the amounts spent by the organization on each "program" and the corresponding percentage of donations. It clearly shows that United Breast Cancer Foundation spent almost no

money on many of the key "programs" (individual grants, breast screenings, breast reconstruction, etc.) described to donors by the ACS Corporate Defendants.

141.   Although it requested them, the ACS Corporate Defendants did not appear to have a policy requiring nonprofits to return completed "Client Profile Updates." Even for organizations that did not return these forms, however, the ACS Corporate Defendants knew about the nonprofits' program spending because the nonprofits' Form 990s and audited financial statements are publicly available. Compliance staff, who had substantial experience in reading nonprofit financials, could and did locate and review these public filings.

142.   Many ACS and CPS managers and other high-level employees also were familiar with Form 990s, and, in numerous instances, they, too, reviewed these documents. As noted above, the nonprofits' Form 990s and audited financial statements showed that, in most instances, only an incidental amount of any donation was spent on the programs touted in solicitations—typically less than five percent of donations, and often far less.

143.   In some instances, as with claims made repeatedly by ACS telemarketers that Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society provided suffering cancer patients with pain medication, paid for chemotherapy, or hospice care, the publicly available Form 990s and audited

financial statements showed that these nonprofits spent nothing at all providing such services.

144.    Sometimes, as with Autism Spectrum Disorder Foundation also dba Autistic Children of America, Cancer Recovery Foundation International dba Women's Cancer Fund, and the now-defunct sham charities Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society, the Form 990s revealed that the "nonprofit" spent more money paying its directors and their associates than helping cancer patients. Cancer Recovery Foundation International dba Women's Cancer Fund, for example, in its 2017 Form 990 reported that it paid two of its three directors $352,319, but spent just $17,485 providing financial assistance to women with cancer (the main program the ACS and Directele Corporate Defendants both have touted to donors). At a minimum, such lopsided spending to benefit private individuals should have raised red flags.

145.    The ACS Corporate Defendants also knew about the nonprofits' program spending—or lack thereof—from their review of nonprofit websites and social media posts. ACS and CPS writers, graphic designers, and compliance staff all looked at these websites. In numerous instances, the websites provided information about program activities that should have provoked questions by the ACS Defendants. For example, a review of the website for Veterans Support Foundation, also dba United States Armed Forces Association, would have raised

questions about the purported national scope of the organization's program providing housing to homeless veterans because the website disclosed that the organization's transitional housing program operated only in Connecticut. The website also featured a map showing that its services were not available nationwide, despite the ACS Corporate Defendants' claims to the contrary. Similarly, reviews of the Cancer Fund or Children's Cancer Fund websites would have shown that these organizations themselves made no claim to provide pain medication to cancer patients—a program they certainly would have highlighted if true.

*The ACS Corporate Defendants Ignored Red Flags about Nonprofits*

146.   The ACS Corporate Defendants also ignored or recklessly disregarded other red flags about nonprofit conduct and legitimacy, and failed to ask questions when they learned of law enforcement inquiries into individual nonprofits. For example, the ACS Defendants knew that Cancer Fund, Children's Cancer Fund, and The Breast Cancer Society had received civil investigative demands for information from 25 Attorneys General and, later, the FTC, expressly seeking information about deceptive charitable solicitations. Despite this knowledge, the ACS Corporate Defendants neither raised questions about nor changed the content of their charitable solicitations for these organizations.

147.   ACS received civil investigative demands or other requests for information about several nonprofits from state attorneys general. This includes inquiries from states about now-defunct National Children's Leukemia Foundation, Firefighters Support Services, and Foundation for American Veterans (all closed as a result of state investigations) as well as Law Enforcement Education Program, Children's Cancer Recovery Foundation, and Breast Cancer Charities of America. Despite these red flags, the ACS Corporate Defendants either failed to seek substantiation for the claims they made to donors, or disregarded the information they had showing that the nonprofits were not meaningfully engaged in the programs described to donors. Instead, they continued making false or misleading representations about these nonprofits until forced to stop because the organization closed.

148.   On one occasion, in May 2015, the ACS Corporate Defendants, as well as Burland and Cole, had actual knowledge that an enforcement action against The Breast Cancer Society was about to be filed that would cause the nonprofit to close. They continued soliciting for it, however, while knowing that there was no possible way that donations made to that organization would be spent for any of the charitable purposes described to donors. Indeed, not only did ACS continue soliciting for The Breast Cancer Society after they learned of its imminent closure,

Cole and Burland directed that ACS telemarketers **increase** the number of

solicitation calls for the soon-to-be defunct nonprofit.

149. The ACS Defendants also failed to ask questions or seek

substantiation from nonprofits that were the subject of significant negative media

attention. For example, a widely covered 2013 CNN and *Tampa Bay Times* report

on the "50 Worst Charities in America" listed several nonprofits for which ACS

solicited. The report included an in-depth story about Cancer Fund's lack of

spending on charitable programs. The same report also featured an article

discussing the fundraising practices of ACS. Despite knowing about this reporting,

the ACS Defendants did not obtain substantiation for claims from any of the

nonprofits featured on that "50 Worst" list. Following that and other news

coverage, the ACS/CPS compliance officer wrote to Burland and Cole:

> Recent highly public, embarrassing, and potentially costly allegations
> that were either published in the press or made by the Michigan
> Attorney General, highlight the need for a process to ensure that
> materials distributed on the sales floor accurately conveys our clients'
> program message. . . .

If ACS adopted such a process, it was not routinely followed.

### The ACS Corporate Defendants Knew that State and Federal Law Prohibits Deceptive Claims

150. The ACS Corporate Defendants knew that making claims about

charitable activities that nonprofits engaged in minimally, if at all, constituted

deceptive acts and practices that violate state and federal law. Among other things,

compliance personnel reviewed and discussed relevant legal standards, including the FTC's standards for substantiation. Indeed, ACS's June 2016 "Fundraising Compliance Manual" (the contents of which were specifically approved by Burland and Cole and distributed to ACS employees) called out conduct that the FTC has alleged as deceptive, including:

a. "Misrepresenting that the donor's contribution will support the donor's local community, unless it's true";

b. "Misrepresenting that the donor's contribution will support particular charitable programs";

c. "Falsely representing that the charity operates particular programs";

d. "Failing to substantiate claims made to donors on behalf of a charity"; and

e. "Using scripts and printed materials that were not approved by the client charity."

151. Even employees involved in creating solicitation materials knew that it was deceptive to emphasize charitable programs on which nonprofits spent only an incidental amount. For example, in June 2015, the CPS employee who drafted written solicitation materials for CPS and CSA, emailed this to a nonprofit:

> Because of legalities and the Attorney General stipulations, we need to know if a significant amount of resources is used for [the program].

For example, if 20% of funds gleaned from donors are used to support this program, that would warrant or at least give me the freedom to focus on it. If however, only 2% of total revenues are appropriated for this program, it would prohibit me from writing copy that would highlight it.

152.   Even knowing this, the same copywriter authored—and CPS and CSA mailed to donors—solicitation materials for numerous nonprofits touting programs on which the nonprofits spent little to no money, including programs on which the nonprofits spent less than two percent of total revenues.

153.   In addition, the ACS Corporate Defendants were familiar with state laws regarding deception because of ACS's experiences with legal actions against it by state charities regulators. In at least six such actions, ACS responded to allegations that its fundraising claims were deceptive. Such actions should have been memorable as they often resulted in settlements where ACS paid fines or civil penalties and agreed to stop solicitations in particular states. Burland and/or Cole signed these settlements on behalf of the corporate entities. (*See* Appendix A.)

154.   Memorable, too, should have been law enforcement actions against some of the nonprofits for which the ACS Corporate Defendants solicited that alleged that the organizations engaged in deceptive acts or practices. Such actions often resulted in the ACS Corporate Defendants losing the ability to solicit for those nonprofits altogether when, because of the legal action, the nonprofits closed.

In other instances, actions against nonprofits resulted in restrictions on the states where the ACS Corporate Defendants could solicit for that nonprofit.

### *Directele Corporate Defendants' Knowledge*

155.   The Directele Corporate Defendants know or recklessly disregard the fact that they are making deceptive representations about nonprofits previously associated with the ACS Corporate Defendants. Among other things, the Directele Corporate Defendants have access to the nonprofits' publicly filed Form 990s and audited financial statements. As noted above, Form 990s and audited financial statements demonstrate the woeful lack of spending by any nonprofit on the charitable programs described to donors. For several nonprofits for which Directele solicits, these financial reports document other questionable spending that should, at a minimum, raise red flags. This includes, for example, reports that the organizations pay officers and directors salaries and benefits in excess of what is spent on the charitable programs.

156.   The former ACS and CPS employees now at Directele, including current co-presidents Gilstorf and Lia, also know about the practices of these nonprofits from their time at ACS and CPS. For example, Gilstorf was copied on an October 2016 email from Stepek discussing the compliance officer's concern with solicitations for United Breast Cancer Foundation focusing on screening or mammograms "because of the low amount of funds being spent on them [by the

organization]." United Breast Cancer Foundation did not materially increase its spending on breast screenings, yet solicitations by both the ACS and Directele Corporate Defendants continued to feature claims about this program.

### The ACS Corporate Defendants Failed to Possess and Rely on Adequate Substantiation for their Claims

157.   The ACS Corporate Defendants routinely failed to possess and rely upon a reasonable basis for claims about nonprofits' provision of program services and the geographic scope and availability of those programs. They sought only superficial approval by the nonprofits of the telephone scripts, pre-recorded audio clips, and printed solicitation materials, and failed to take other steps to ensure that the claims they made were truthful and accurate.

158.   On some occasions, especially in connection with telemarketing scripts, they failed even to obtain such superficial approvals. For example, numerous soundboard scripts for The Breast Cancer Society were not approved by the nonprofit prior to their use. As the compliance officer noted in a 2013 email to another CPS employee,

> As you know, I've been pushing for years to obtain written client approval for scripting. While for new clients, it has worked, but for long time clients, it has been a challenge, to say the least. Senior Managers are reluctant to submit to oversight (accountability) on scripting and Dick has never had my back on this, so there have been setbacks to my ability to accomplish what needs to happen.

159.    Relying solely on a signature from a nonprofit executive as substantiation was not reasonable under the circumstances. Such a blessing did not obviate the need for the ACS Corporate Defendants to substantiate the claims they made. This is especially the case when they knew or should have known that the claims were false or misleading because of the ready availability of nonprofit financial information. When the ACS Corporate Defendants lacked nonprofit approval for the claims, they had no basis at all.

160.    Moreover, the ACS Corporate Defendants knew about the importance of obtaining substantiation for the claims they made. In a November 2015 email, the ACS/CPS compliance officer explained to Veterans Support Foundation officers that government regulators believe that "outside professional fundraisers have a duty to periodically ask their clients for a bit more detail about how the money they raise for a charity is actually spent."

### ACS and Directele Engaged in Abusive Illegal Telemarketing Practices

#### Repeated and Harassing Telephone Calls

161.    ACS blanketed the nation with telemarketing calls deceptively soliciting charitable contributions. From 2016 through September 2019, ACS initiated more than 1.3 billion calls that were answered in person or by voice mail at more than 67 million telephone numbers. This includes calls to residents in each of the Plaintiff States. (*See* Appendix B for a breakdown of call volumes by state.)

ACS called more than 7.8 million of these telephone numbers repeatedly, calling with excessive frequency under the circumstances. It called more than 5,000 unique numbers 500 times or more.

162.   Under the Telemarketing Sales Rule, it is an abusive telemarketing act or practice and a violation of the Rule for a telemarketer to cause any telephone to ring, or engage any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number. 16 C.F.R. § 310.4(b)(1)(i).

163.   By any metric, ACS's calls were repeated or continuous and intruded on individuals with astonishing frequency. For example:

a.      ACS called over 7.8 million individual telephone numbers each at least twice in a 60-minute period. More than 235,000 of those phone numbers each were called three or more times in that 60-minute period.

b.      ACS called over 2.29 million individual telephone numbers each three or more times in a single day. More than 520,000 of those numbers each were called three or more times in a day for two days in a row.

c.      ACS called over 1.3 million individual telephone numbers more than 10 times each in a single week.

d.      ACS called over 358,000 individual telephone numbers 30 or more times each in a one-month period.

e.      ACS called over 370,000 individual telephone numbers each more than 100 times in one year.

164.   ACS persisted in its high-volume calling campaign fully aware that its calls were not welcomed by the vast majority of the individuals it called. Among other things, very few of its calls resulted in donations. ACS call volume data submitted by Stepek to ACS's dialer vendor in December 2015 showed that of the 1.75 million calls that ACS placed daily, less than one percent of the calls led to the promise of a donation. Additionally, ACS received thousands of complaints daily. At one point in February 2016, the compliance manager emailed ACS management, including Stepek and Lucidi, that the volume of complaints from regulators and individuals was exceeding 2,000 per day. Additionally, former ACS telemarketers and soundboard operators reported a high volume of hang-ups. These former employees also noted that when individuals answered calls and engaged, many made do not call requests, and complained about repeated unwanted calls. This was especially true for calls made with soundboard technology; former ACS soundboard operators reported that, in most instances, as soon as individuals realized they were hearing prerecorded messages they would either hang up or ask not to be called again.

165.   The sheer volume and frequency of repeated calls to the same numbers evidences the intent of ACS to annoy, abuse, or harass any person at the called number.

### *Unlawful Use of Prerecorded Messages*

166.   Since at least 2016, ACS used soundboard technology to interact with donors in almost all of its fundraising calls. Since 2020, Directele also has used soundboard technology in at least some of its fundraising calls. As noted earlier, in soundboard calls live soundboard operators communicate with donors by playing prerecorded audio clips to them. Every ACS soundboard call violated the TSR, as did many or all Directele soundboard calls.

167.   Under the TSR, it is an abusive telemarketing act or practice, and a violation of the Rule, for a telemarketer to initiate any outbound telephone call that delivers a "prerecorded message," including a call to induce a charitable contribution. 16 C.F.R. § 310.4(b)(1)(v). The TSR offers an exception for calls made to a charitable organization's members or previous donors if, among other things, the telemarketer discloses that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request at any time during the message, and makes such a mechanism available. 16 C.F.R. § 310.4(b)(1)(v)(B)(ii)(A). Soundboard calls are subject to this provision of the TSR because they deliver prerecorded messages.

168.   Each soundboard call that ACS or Directele placed soliciting charitable contributions from donors who were neither members of nor previous donors to the nonprofit organization on whose behalf the calls were made (known as "cold calls") violated this provision of the TSR. 16 C.F.R. § 310.4(b)(1)(v).

169.   Additionally, each of ACS's soundboard calls and some or all of Directele's soundboard calls to members of or prior donors to the nonprofit organization on whose behalf the calls were made also violated the TSR. At no point during any soundboard call did ACS affirmatively provide these call recipients the opportunity to opt out of future solicitation calls. ACS offered no automated interactive voice or keypress-activated opt-out mechanism that would allow call recipients to assert a Do Not Call request. Instead, ACS allowed its soundboard operators to place an individual on the entity-specific Do Not Call list for the nonprofit on whose behalf the call was made only if the individual raised the issue and specifically requested it. In numerous instances, Directele also has made soundboard calls to prior donors without an affirmative opt-out mechanism. Thus, all soundboard calls made by ACS and any calls made by Directele without an affirmative opt-out mechanism do not fit within the TSR's exception for calls to existing members and donors, 16 C.F.R. § 310.4(b)(1)(v)(B)(ii)(A).

## *ACS Knew Its Soundboard Calls Violated the TSR*

170.   ACS and Directele knew that the TSR, by its plain text, prohibits the delivery of prerecorded messages, and that soundboard technology delivers prerecorded messages. Two senior ACS employees, Defendants Stepek and Lucidi, served on the board of directors of a soundboard industry trade group, the Soundboard Association, which met with FTC staff regarding its members' obligations under the TSR in 2016. On November 10, 2016, FTC staff issued a non-binding advisory letter informing the industry of its view that soundboard technology delivers prerecorded messages as defined by the TSR. *See* https://www.ftc.gov/system/files/documents/advisory_opinions/letter-lois-greisman-associate-director-division-marketing-practices-michael-bills/161110staffopsoundboarding.pdf.

171.   On January 23, 2017, the Soundboard Association sued the FTC seeking invalidation of the staff advisory letter, alleging both that it constituted a "legislative rule" under the Administrative Procedure Act ("APA") and that it was an unconstitutional content-based regulation on speech. Stepek submitted a declaration in support of the Soundboard Association action, signed and sworn on January 9, 2017, describing ACS's use of soundboard technology (noting, among other things, that more than 90 percent of ACS calls used soundboard technology). The District Court rejected the Soundboard Association's challenge, finding that

the letter was an interpretive rule not subject to the same procedural requirements under the APA and that the regulation in question was content neutral. *Soundboard Assoc. v. FTC*, 251 F. Supp. 3d 55 (D.D.C. 2017). The Soundboard Association appealed, but the Court of Appeals found that the letter was not a "final agency action" subject to judicial review and dismissed the case entirely. 888 F.3d 1261 (D.C. Cir. 2018). The Supreme Court denied the Soundboard Association's petition for certiorari. 139 S. Ct. 1544 (2019). Throughout and after this process, and despite Defendants' knowledge of the Rule, ACS continued using soundboard technology to bombard the public with calls delivering prerecorded messages.

172.   In its November 2016 advisory letter, FTC staff rescinded an earlier, non-binding 2009 staff advisory letter stating that the soundboard use might comply with the TSR if the technology was employed "in a manner virtually indistinguishable from calls conducted by live operators." Specifically, the 2009 letter advised that telemarketers might lawfully employ soundboard where a "live agent . . . controls the content and continuity of what is said to respond to concerns, questions, comments—or demands—of the call recipient." In such calls, the agent would "hear every word spoken by the call recipient" and "stay[] with [the] call from beginning to end."

173.   Throughout the relevant period, ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi knew that ACS and Directele's use of soundboard

was inconsistent with the conditions set forth in the then-rescinded 2009 advisory letter. Among other things, ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi knew that ACS and Directele's calls using soundboard technology were not indistinguishable from those made by live telemarketers and did not mimic natural one-on-one conversations because soundboard operators typically handled multiple calls at a time.

174.   ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi also knew that, in numerous instances, ACS and Directele's soundboard calls did not mimic natural conversations because ACS and Directele monitored and graded its soundboard operators' use of the technology during calls. At ACS, soundboard operators who selected the correct audio clip in the correct amount of time with 75 percent accuracy received bonuses, but many employees did not achieve such high accuracy rates. From its monitoring and grading of calls, ACS knew that, on occasion, soundboard operators would play audio clips that did not appropriately respond to call recipients' statements, let recordings play over call recipients who were speaking, or leave unnatural pauses before playing audio clips. Former ACS soundboard operators confirm that these practices happened. Additionally, given that they were listening to three calls simultaneously, it is unlikely that ACS soundboard operators in fact heard every word spoken by the call recipient. Indeed, one former soundboard operator stated that she only listened for key words and did

not really know what the call recipients were saying. Some former soundboard operators also noted that there were not always appropriate audio clips available to answer donors' questions.

175.   When donors had questions that soundboard operators could not answer with audio clips, employees did not interject with their own "live" voices. Rather, they were trained to play an audio clip that offered to let the call recipient talk with a supervisor. ACS discouraged call recipients from making such requests. At Lucidi's suggestion, ACS changed this audio clip so that it warned call recipients that it could take two to three minutes for a manager to be available to speak with them, even though this was not true. For example, the clip for a Veterans Support Foundation solicitation stated,

> Actually, I'm in training right now and don't have the answer to that, but if you would like, I can get my manager and they can answer it for you. It may take two or three minutes, but would you like me to get my manager?

176.   In an email to Stepek, among others, Lucidi explained, "the entire goal" of adding the wait time notice "is to give the consumer an easy chance to hang up. The benefit is less time spent with trainers tied up on calls and increased production due to more calls being made." Actually answering the donor's question was not a priority.

***CPS Provided Substantial Assistance to ACS's Abusive Telemarketing Calls, as did Dale Corp. to Directele's Abusive Telemarketing Calls, While Knowing or Consciously Avoiding Knowing of the Abusive Practices***

177.   CPS substantially assisted ACS and Dale Corp. is substantially assisting Directele in their respective abusive telemarketing practices. Among other things, CPS employees managed the computer hardware and software powering the calls, loaded the dialers with fresh leads, and engaged in trouble-shooting problems with the software. Dale Corp. employees provide support to Directele. Both CPS and Dale Corp. have known, or have consciously avoided knowing of ACS and Directele's practices, respectively, because of the close inter-relationship between the companies. For example, not only did CPS information technology employees have direct knowledge of ACS call volumes and use of soundboard technology, CPS compliance officials reviewed ACS soundboard scripts and CPS personnel reviewed calls and responded to donor complaints. Moreover, for at least part of the relevant time period in 2018 and 2019, Stepek was the Chief Executive Officer of CPS and his knowledge of the unlawful nature of ACS's soundboard calls can be imputed to the company. Similarly, because of Gilstorf and Lia's management of the operations of both Directele and Dale Corp. their personal knowledge of each company's practices can be imputed to the other.

### *ACS and Directele Soundboard Calls Violated State Law*

178.   The laws regulating charitable solicitations of numerous Plaintiff States require that individual solicitors disclose their true name. The audio clips played at the beginning of each call by ACS and Directele soundboard operators did not disclose the name of the person controlling the call. For example, a representative audio clip played at the beginning of calls for Cancer Recovery Foundation International dba Women's Cancer Fund stated: "Getting hold of you is harder than getting my husband to pick up his socks. This is Jessica with AC Services calling on behalf of Women's Cancer Fund."

179.   In fact, call recipients were not talking with Jessica, but rather were interacting with soundboard operators whose names were never disclosed.

### *Individual Defendants' Knowledge, Authority to Control, and Participation in the Deceptive Fundraising Scheme and Abusive Telemarketing Practices*

180.   The Individual Defendants in charge of the telemarketing scheme at ACS and CPS—Cole, Burland, Stepek, Gilstorf, Lia, and Lucidi—all knowingly participated in, controlled, and had the authority to control the deceptive fundraising claims and abusive telemarketing practices of one or more of the ACS Corporate Defendants. Cole, Burland, and Gilstorf also knowingly participated in, controlled, and had the authority to control the deceptive fundraising claims made by the Directele Corporate Defendants between 2018 and September 2019. Gilstorf and Lia, who became co-presidents of, and assumed control over the Directele

Corporate Defendants in October 2019, currently are knowingly participating in, controlling, or have the authority to control the deceptive fundraising claims and abusive telemarketing practices of the Directele Corporate Defendants. Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi also had actual knowledge or knowledge fairly implied on the basis of objective circumstances that ACS's use of soundboard technology violated the TSR and that its extraordinarily high volume of continuous and repeated calls was abusive. Amy Burland and Barbara Cole both knowingly participated in, controlled, and had the authority to control the acts of CSA.

### *Cole, Burland, Stepek, Gilstorf, Lia, and Lucidi Knowingly Participated in, Controlled, or Had the Authority to Control the Corporate Defendants' Deceptive Practices*

181.  Burland and Cole were co-presidents of ACS and co-managers of CPS, and shared overall control of these corporate Defendants. They also managed the acts and practices of CSA. Both participated in high-level decisions about the fundraising operation, including but not limited to contracting with particular nonprofits and adopting the use of soundboard technology. Among other things, Burland and Cole each signed contracts with nonprofits on behalf of ACS and CPS; Cole also signed contract documents on behalf of CSA. In various state charitable solicitation registration filings both Burland and Cole identified themselves as president of ACS and indicated that the signer had control over

ACS's financial records. Both were, in fact, signers on various ACS and CPS corporate bank accounts.

182.   Burland's operational responsibilities included oversight of compliance with federal, state, and local laws regarding professional telemarketing. Among other things, he negotiated and/or signed settlements of state enforcement actions on behalf of ACS and CSA. He also communicated with state charity officials on behalf of CSA and handled its accounting.

183.   Cole was responsible for the day-to-day management of the companies. He also managed the corporate relationships with both new and existing nonprofits, often traveling to attend nonprofit board meetings. In addition, Cole negotiated with, approved payments to, and signed contracts between ACS and telecommunications and software vendors that supplied ACS with the technology necessary for its telemarketing scheme.

184.   At various times Cole and Burland were compensated by ACS and/or CPS, and CPS paid $5,200 per month towards a mortgage for Burland. Burland and Cole also received payments from CSA.

185.   Burland and Cole each acted with actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of misrepresentations, or had an awareness of a high probability of fraud along with an intentional avoidance of the fact that the claims made by the ACS Corporate

Defendants about the nonprofits' charitable programs were false or misleading and deceptive. Both Burland and Cole knew about internal conversations between compliance personnel and others, law enforcement actions, and media reports that called into question the truthfulness of claims the ACS Corporate Defendants made about nonprofit programs. Both were aware of ACS's use of soundboard technology and the volume and frequency of fundraising calls to donors. They also knew about the legal landscape in which they operated. Among other things, they signed ACS's June 2016 "Fundraising Compliance Manual" distributed to employees. This manual specifically stated that ACS and its individual officers were subject to FTC and/or state enforcement action for violations of the TSR, or for engaging in deceptive or misleading fundraising representations, and state charitable solicitation laws.

186.   Stepek also participated in, controlled, and had the authority to control the unlawful acts and practices of ACS and CPS. Stepek held multiple leadership roles at both ACS and CPS. Prior to 2017, he was a Senior Manager, but in 2017, he assumed the title of Vice President of ACS. In 2019, he was listed as the CEO of CPS. In a 2017 sworn declaration filed in federal court, Stepek described his job duties: "I have helped to formulate and implement ACS' business operations and strategies, manage client and vendor relationships (including ACS' relationship with its soundboard

technology suppliers), and oversee ACS' outbound telephone calling

practices. . . ."

187.   Stepek's involvement with ACS's telemarketing practices included, in

numerous instances, participating in the drafting, testing, recording and approval of

the prerecorded audio clips played to donors. In his role at CPS, Stepek managed

day-to-day operations including compliance, print and mail, and human resources.

Throughout his tenure, Stepek was more concerned with creating effective sales

pitches than obtaining nonprofit approvals or ensuring that solicitations were not

false or misleading.

188.   Stepek acted with actual knowledge of material misrepresentations,

reckless indifference to the truth or falsity of misrepresentations, or had an

awareness of a high probability of fraud along with an intentional avoidance of the

fact that the claims made about the nonprofits' charitable programs were false or

misleading and deceptive. Stepek knew about and participated in internal

conversations with compliance personnel, law enforcement actions, and media

reports that called into question the truthfulness of claims the ACS Corporate

Defendants made about nonprofit programs. Among other things, he (along with

Defendant Lia) received an email from ACS compliance staff that said "NOT

TRUE" about the claim in a script that United Cancer Support Foundation was

providing free mammograms—a claim that the ACS Corporate Defendants

nonetheless continued to make. Stepek also knew that United Cancer Support Foundation spent only an incidental amount on its charitable programs. Among other things, Stepek was copied on an October 2016 email to the organization's Executive Director telling her that ACS was removing from its scripts any references to "your contribution goes a long way." (Such references later returned to the United Cancer Support Foundation scripts, even though the organization did not increase its spending.) Stepek was also aware of ACS's use of soundboard technology and the volume and frequency of telemarketing calls to donors.

189.    ACS senior managers Gilstorf, Lia, and Lucidi each participated in, controlled, and had the authority to control ACS's telemarketing practices, including its use of soundboard technology. All three managed ACS telemarketing rooms. Gilstorf and Lia controlled ACS's live telemarketing call center in Dearborn, Michigan and later served as managers at its soundboard call center in Southfield, Michigan. Lucidi managed the soundboard operations in Southfield. As senior managers, they each supervised staff including telemarketers, reviewed and edited telemarketing scripts, reviewed and addressed complaints from the public and state charities regulators, and assisted in the overall management of ACS's call centers. Lucidi also reviewed and commented on written solicitation materials.

190.    Gilstorf, Lia, and Lucidi each acted with actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of

misrepresentations, or had an awareness of a high probability of fraud along with an intentional avoidance of the fact that the claims made about the nonprofits' charitable programs were false or misleading and deceptive. In their management roles, Gilstorf, Lia, and Lucidi knew about internal communications with compliance personnel, law enforcement actions, and media reports that called into question the truthfulness of claims ACS made about nonprofit programs. For example, internal emails show that telemarketers under Lia's direction placed calls for Law Enforcement Education Program that ACS's own compliance department worried would mislead donors. The compliance department expressed concern to Lia about the claimed local impact of donations and about promotion of a program that the nonprofit no longer operated. Similarly, Gilstorf was copied on emails about the low amount of funds spent on programs mentioned in scripts for some nonprofits. Gilstorf, Lia, and Lucidi also knew about ACS's use of soundboard technology and the volume and frequency of telemarketing calls to donors. As noted above, Lucidi also served on the board of directors of the Soundboard Association and in that capacity was familiar with the TSR's prohibitions regarding prerecorded messages.

191.   From at least May 2018 through October 15, 2019, Cole had the authority to control the practices of the Directele Corporate Defendants. Burland shared that control until at least August 1, 2019. Not only did they cause ACS or

CPS to pay Gilstorf while she was working as the Chief Operating Officer of the Directele Corporate Defendants from around November 2018 to September 2019, they also contracted to serve as consultants over the Directele Corporate Defendants' entire fundraising operation. Gilstorf has participated in and had both the authority to control and actual control over the fundraising practices of the Directele Corporate Defendants since around November 2018. In both her present capacity as owner of the companies and in her prior position as Chief Operating Officer, Gilstorf hired and supervised employees, including telemarketers, communicated with nonprofits, and exercised general management of the telemarketing operations. Beginning in October 2019, when he became co-president of the Directele Corporate Defendants, Lia also participated in, had authority to control, and actual control over their fundraising practices. From their experiences while working at the ACS Corporate Defendants, Burland, Cole, Gilstorf, and Lia each acted in connection with the Directele Corporate Defendants with actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of misrepresentations, or had an awareness of a high probability of fraud along with an intentional avoidance of the fact that the claims made by the Directele Corporate Defendants about the nonprofits' charitable programs were false or misleading and deceptive. When, in 2020, Directele began using

soundboard technology to call donors, Gilstorf and Lia were well aware of how the technology worked, including its delivery of prerecorded messages to donors.

192.   Barbara Cole and Amy Burland were the owners, co-presidents, and managing members of CSA. They participated in, controlled, or had the authority to control CSA, and did so with actual knowledge of material misrepresentations by CSA, reckless indifference to the truth or falsity of misrepresentations by CSA, or with an awareness of a high probability of fraud along with an intentional avoidance of the fact that the claims made by CSA were deceptive. For example, as owners and managing members of CSA, each signed agreements between CSA and nonprofits for CSA to engage in direct mail fundraising on behalf of those organizations. Among other things, the contracts, or addenda thereto, called for CSA to be paid 85 percent of each donation it solicited. Each signed applications and reports to register CSA as a professional fundraiser or fundraising consultant with certain states. This includes registration statements filed by CSA in the Commonwealth of Kentucky in 2018 and 2019, in which CSA falsely responded that it was not aware of any pending investigations by any government agencies into its business operations as a fundraising consultant. Amy Burland signed these registration statements in December of 2017 and 2018, swearing that the statements in them were true. The statements, however, were false. CSA received a civil investigative demand about its fundraising practices from the FTC in October

2017, and retained an attorney to respond to the investigative demand. Barbara Cole signed the CSA checks to the Commonwealth of Kentucky for those false 2018 and 2019 registration statements.

193.   Given their control over CSA's bank accounts, Amy Burland and Barbara Cole were active and knowing participants in keeping the ACS, CPS, and CSA common enterprise afloat. Not only did each receive payments from CSA (along with their husbands), but payments made from CSA accounts and signed by one of the two routinely went to ACS, CPS, or their creditors. When Cole and Burland began courting the Directele Corporate Defendants it was CSA, under the financial direction of Amy Burland and Barbara Cole, that funneled more than $170,000 into the Directele Corporate Defendants' coffers. Both Barbara Cole and Amy Burland knew about the allocation of revenues between the ACS Corporate Defendants and the nonprofits, the paucity that the nonprofits spent on their programs, and the content of the direct mail solicitations created by CPS on behalf of CSA. They also knew about or were deliberately indifferent to the law enforcement actions targeting ACS and the nonprofits for which it solicited.

### *Harm to Donors*

194.   The ACS Defendants intruded into the lives of more than 67 million telephone subscribers with their illegal and deceptive charitable solicitations. Generous donors responded to their solicitations and contributed over $110

million, believing that their money was going to support the charitable programs described to them. The Directele Defendants are continuing the deceptive scheme, also promising donors that their contributions will be spent helping worthy-sounding causes, in numerous instances using unlawful pre-recorded messages to do so.

195.   There is reason to believe that many of those generous donors were older adults, and that ACS's unlawful telemarketing practices disproportionately affected this vulnerable population. Numerous former ACS telemarketers reported that most of the donors they spoke with were elderly. Many telemarketers also observed that older adults were more likely than younger ones to be fooled by the prerecorded messages into believing they were talking to another person naturally, and, as a result, not hang up on the call. ACS managers tacitly recognized the value of its "55+" leads, renaming the list of potential 55+ donors who had not previously been called "Cold Gold Leads."

196.   In fact, the vast majority of donors' contributions went to the Defendants and only incidental amounts were spent helping the causes that donors were told that their donations would support. Under these circumstances, individual donors were deceived, and their charitable contributions largely wasted. In addition, donors had less money available to support the many legitimate charitable organizations operating real charitable programs.

197.   Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe the Defendants are violating or are about to violate laws enforced by the Commission. The Directele Corporate Defendants, Gilstorf, and Lia are actively engaging in the unlawful deceptive and unlawful conduct alleged above. In addition, although the ACS Corporate Defendants stopped telemarketing in September 2019, they, under the direction of Burland, Cole, Amy Burland, Barbara Cole, Stepek, Gilstorf, Lia, and Lucidi, repeatedly engaged in unlawful acts and practices. They engaged in fraudulent and deceptive charitable solicitations since at least 2008, and also engaged in unlawful abusive telemarketing practices since at least 2016. These Defendants engaged in their unlawful practices willfully and knowingly, including after numerous prior state enforcement actions alleging they engaged in unlawful conduct. Moreover, the ACS Corporate Defendants ceased operating the same week that CPS acknowledged that reorganization in bankruptcy was impossible. CPS only made that concession after the FTC objected to aspects of its proposed disclosure statement and plan of reorganization, in which CPS had attempted to absolve both itself and its employees of liability for their lawbreaking. The bankruptcy court then dismissed the bankruptcy, in part because a reorganized CPS would likely be unable to function profitably in light of FTC and other regulatory scrutiny.

## DEFENDANTS' LAW VIOLATIONS

### COUNT I
### Misrepresentations about Program Benefits
### *(By the FTC and the Plaintiff States as to all Defendants except that Iowa, Oregon and the District of Columbia do not join in the allegations with respect to the Directele Corporate Defendants).*

198. Plaintiffs incorporate by reference Paragraphs 52–197.

199. In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to fund particular charitable programs. Such representations have included, but are not limited to, claims that contributions would be used to:

    a.    Help cancer patients, including by providing financial assistance to individuals with cancer or to the families of children with cancer; providing pain medication to alleviate the suffering of cancer patients; or paying for hospice care for dying children, breast reconstruction, chemotherapy, college scholarships or attendance at special camps, and special gifts for cancer patients;

    b.    Help prevent or detect cancer, including by providing free or low cost cancer screenings or by funding cancer research;

    c.    Provide financial assistance to needy or disabled veterans or help provide housing to homeless veterans; or

      d.     Provide financial assistance to fire victims, provide safety equipment to fire departments, or provide firefighters with death benefits.

200.   In truth and in fact, in numerous instances in which the Defendants have made the representations set forth in Paragraph 199, little or none of the donors' contributions have been spent on any of the particular charitable programs described to them, specifically including programs to:

      a.     Help cancer patients, including by providing financial assistance to individuals with cancer or to the families of children with cancer; providing pain medication to alleviate the suffering of cancer patients; or paying for hospice care for dying children, breast reconstruction, chemotherapy, college scholarships or attendance at special camps, or special gifts for cancer patients;

      b.     Help prevent or detect cancer, including by providing free or low cost cancer screenings or by funding cancer research;

      c.     Provide financial assistance to needy or disabled veterans or help provide housing to homeless veterans; or

      d.     Provide financial assistance to fire victims and provide safety equipment to fire departments, or provide firefighters with death benefits.

201. Therefore, the Defendants' representations described in Paragraph 199 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

202. The foregoing practices also violate the laws of each Plaintiff State as follows:

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-5(27) and 13A-9-76(a)(3). |
| California | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12580 through 12599.8. |
| Colorado | COLO. REV. STAT. § 6-1-105(1)(hh); §§ 6-16-111(1)(g) and (i). |
| Connecticut | CONN. GEN. STAT. §§ 21a-190f(e) and 42-110b(a).[2] |
| Delaware | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida | FLA. STAT. § 501.204(1); and §§ 496.415-416 (2020). |
| Georgia | GA. CODE ANN. § 10-1-393 (2017); and 43-17-12(d) (2016). |
| Illinois | 225 ILL. COMP. STAT. § 460/9(c). |
| Indiana | IND. CODE §§ 23-7-8-7(a)(4); and 24-5-0.5-3(b)(1) and (7). |
| Iowa | IOWA CODE § 714.16. |
| Kansas | KAN. STAT. ANN. §§ 17-1769(a), (b), (c), and (h). |
| Kentucky | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine | ME. REV. STAT. tit. 5, § 207 (2019). |
| Maryland | MD. CODE ANN., BUS. REG. §§ 6-607, 6-608 (LexisNexis 2015 and 2020 Suppl.). |
| Massachusetts | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan | MICH. COMP. LAWS §§ 400.288 (f), (i), (n), (o), and (q). |
| Missouri | MO. REV. STAT. § 407.020. |
| Montana | MONT. CODE ANN. § 30-14-103. |
| Nebraska | NEB. REV. STAT. §§ 59-1602, 87-302(A)(21), and 87-303.01. |
| Nevada | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |

---

[2] For purposes of this Count I, Plaintiff State of Connecticut does not incorporate by reference Paragraphs 134-35.

| STATE | STATUTORY AUTHORITY |
|---|---|
| New Hampshire | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), and (e); and 358-A:2. |
| New Jersey | N.J. STAT. ANN. §§ 56:8-2.7, 45:17A-32(a), 45:17A-32(c); and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico | N.M. STAT. ANN. 1978, §§ 57-22-6.3(A)(1), (3); 57-22-8(A), (B); and 57-12-3. |
| New York | NY EXEC. L. §§ 63(12) and 172-d(1)-(3); N.Y. GEN'L BUS. L. § 349. |
| North Carolina | N.C. GEN. STAT. §§ 75-1.1, 131F-20, and 131F-21. |
| Ohio | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma | OKLA. STAT. tit. 18 § 552.14a(A)(5). |
| Oregon | OR. REV. STAT. §§128.886 and 646.608(1)(dd). |
| Pennsylvania | PA. STAT. TITLE 10 § 162.15(a)(2). |
| Tennessee | TENN. CODE ANN. §§ 48-101-513(a), (b) and (d). |
| Texas | TEX. BUS. & COM. CODE ANN. § 17.46(a), (b)(3), (b)(5) and (b)(24). |
| Utah | UTAH CODE ANN. §§ 13-11-4(1), (2)(a), (o); 13-22-13(3); and 13-26-11(1)(c). |
| Virginia | VA. CODE ANN. § 57-57(L). |
| Washington | WASH. REV. CODE §§ 19.86.020, 19.09.100, and 19.09.340. |
| West Virginia | W. VA. CODE §§ 29-19-8 through 29-19-13; and 46A-6-101 through 46A-6-104. |
| Wisconsin | WIS. STAT. § 202.16(1)(a), (g), and (k). |
| Wyoming | WYO. STAT. ANN. § 40-12-105(a)(xv). |

## COUNT II
### Misrepresentations about Geographic Connections
### *(By the FTC and the Plaintiff States as to all Defendants except that Iowa, Oregon and the District of Columbia do not join in the allegations with respect to the Directele Corporate Defendants)*

203.   Plaintiffs incorporate by reference Paragraphs 52–197.

204.   In numerous instances, in connection with soliciting charitable

contributions from donors, Defendants have represented, directly or indirectly,

expressly or by implication, that there is a local connection between the fundraiser or the nonprofit and the donor, including by representing that:

     a.    Fundraising calls originated from a state or region local to the call recipient by causing the Caller ID displayed on the call recipient's phone to display an area code from that person's state or region;

     b.    Donors' contributions would benefit persons or programs in the donor's state or local community; or

     c.    Donors' contributions could benefit persons or programs on a nationwide basis because the nonprofit operated programs throughout the country.

205.   In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 204:

     a.    Fundraising calls originated from Michigan, the Philippines, or India and not from a state or region local to the call recipient;

     b.    Donors' contributions would not be used to benefit persons or programs in the donor's state or local community because the nonprofit did not operate programs in that state or local community; or

     c.    Donors' contributions would not be used to benefit persons or programs on a nationwide basis because the nonprofit did not operate programs throughout the country.

206. Therefore, the Defendants' representations described in Paragraph 204 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

207. The foregoing practices also violate the laws of each Plaintiff State as follows:

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-5(27) and 13A-9-76(a)(3). |
| California | CAL. BUS. & PROF. CODE §§ 17200 through 17206, CAL. GOV. CODE §§ 12580 through 12599.8. |
| Colorado | COLO. REV. STAT. § 6-1-105(1)(hh); and 6-16-111(1)(g), (i), and (k). |
| Connecticut | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a).[3] |
| Delaware | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida | FLA. STAT. §§ 501.204(1); and 496.415-416 (2020). |
| Georgia | GA. CODE ANN. § 10-1-393 (2017). |
| Illinois | 225 ILL. COMP. STAT. § 460/9(c). |
| Indiana | IND. CODE §§ 23-7-8-7(a)(4); and 24-5-0.5-3(b)(1) and (7). |
| Iowa | IOWA CODE § 714.16. |
| Kansas | KAN. STAT. ANN. §§ 17-1769(a), (b), (c), and (h). |
| Kentucky | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine | ME. REV. STAT. tit. 5, § 207 (2019). |
| Maryland | MD. CODE ANN., BUS. REG. §§ 6-607, 6-608 (LexisNexis 2015 and 2020 Suppl.). |
| Massachusetts | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan | MICH. COMP. LAWS §§ 400.288(n), (o), and (q). |
| Missouri | MO. REV. STAT. § 407.020. |
| Montana | MONT. CODE ANN. § 30-14-103. |
| Nebraska | NEB. REV. STAT. §§ 59-1602, 87-302(A)(21), 87-303.01, and 86-2,117. |
| Nevada | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |

[3] For purposes of this Count II, Plaintiff State of Connecticut does not incorporate by reference Paragraphs 134-35.

| STATE | STATUTORY AUTHORITY |
|---|---|
| New Hampshire | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), and (e); and 358-A:2. |
| New Jersey | N.J. STAT. ANN. §§ 56:8-2.7, 56:8-128(d), 45:17A-32(a), 45:17A-32(c); and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico | N.M. STAT. ANN. 1978, §§ 57-22-6.3(A)(1), (3); 57-22-8(A), (B); and 57-12-3. |
| New York | NY EXEC. L. §§ 63(12) and 172-d(1)-(3); N.Y. GEN'L BUS. L. § 349. |
| North Carolina | N.C. GEN. STAT. §§ 75-1.1, 75-102(i), 131F-20, and 131F-21. |
| Ohio | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma | OKLA. STAT. tit. 18 § 552.14a(A)(5). |
| Oregon | OR. REV. STAT. §§128.886 and 646.608(1)(dd). |
| Pennsylvania | PA. STAT. TITLE 10 § 162.15(a)(2). |
| Tennessee | TENN. CODE ANN. §§ 48-101-513(a), (b) and (d). |
| Texas | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(1)-(5) and (b)(24). |
| Utah | UTAH CODE ANN. §§ 13-11-4(1); (2)(w); 13-22-13(3); and 13-26-3(5) |
| Virginia | VA. CODE ANN. § 57-57(L). |
| Washington | WASH. REV. CODE §§ 19.86.020, 19.09.100, and 19.09.340. |
| West Virginia | W. VA. CODE §§ 29-19-8 through 29-19-13; and 46A-6-101 through 46A-6-104. |
| Wisconsin | WIS. STAT. § 202.16(1)(a). |
| Wyoming | WYO. STAT. ANN. § 40-12-105(a)(xv). |

## COUNT III
### Failure to Substantiate Claims
***(By the FTC and the Plaintiff States of Alabama, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Washington, West Virginia, and Wyoming as to the ACS Defendants)***

208.   Plaintiff FTC and the Plaintiff States of Alabama, Colorado,

Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas,

Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Washington, West Virginia, and Wyoming incorporate by reference Paragraphs 52–197.

209.   In numerous instances, by making the representations set forth in Paragraphs 199 and 204 to donors while soliciting contributions, the ACS Defendants have represented, directly or indirectly, expressly or by implication, that they possessed and relied upon a reasonable basis that substantiated such representations at the time the representations were made.

210.   In truth and in fact, the ACS Defendants did not possess and rely upon a reasonable basis that substantiated such representations, at the time the representations were made.

211.   Therefore, the ACS Defendants' representations as alleged in Paragraph 209 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act.

212.   The foregoing practices also violate the laws of each the Plaintiff States as follows:

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-5(27) and 13A-9-76(a)(3). |
| Colorado | COLO. REV. STAT. § 6-1-105(1)(hh); and 6-16-111(1)(g) and (i). |
| Connecticut | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a).[4] |
| Delaware | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida | FLA. STAT. §§ 501.204(1); and 496.415 (2020). |
| Georgia | GA. CODE ANN. § 10-1-393 (2017). |
| Illinois | 225 ILL. COMP. STAT. § 460/9(c). |
| Indiana | IND. CODE §§ 23-7-8-7(a)(4); and 24-5-0.5-3(b)(1) and (7). |
| Iowa | IOWA CODE § 714.16. |
| Kansas | KAN. STAT. ANN. §§ 17-1769(a), (b), and (c). |
| Kentucky | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine | ME. REV. STAT. tit. 5, § 207 (2019). |
| Maryland | MD. CODE ANN., BUS. REG. §§ 6-607, 6-608 (LexisNexis 2015 and 2020 Suppl.). |
| Massachusetts | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan | MICH. COMP. LAWS § 400.288(q). |
| Missouri | MO. REV. STAT. § 407.020. |
| Nebraska | NEB. REV. STAT. §§ 59-1602, 87-302(A)(21), and 87-303.01. |
| Nevada | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Mexico | N.M. STAT. ANN. 1978, §§ 57-22-6.3(A)(1), (3); 57-22-8(A), (B); and 57-12-3. |
| New York | NY EXEC. L. §§ 63(12) and 172-d(1)-(3); N.Y. GEN'L BUS. L. § 349. |
| North Carolina | N.C. GEN. STAT. §§ 75-1.1, 131F-20, and 131F-21. |
| Oklahoma | OKLA. STAT. tit. 18 § 552.14a(A)(5). |
| Oregon | OR. REV. STAT. §§128.886 and 646.608(1)(dd). |
| Pennsylvania | PA. STAT. TITLE 10 § 162.15(a)(2). |
| Tennessee | TENN. CODE ANN. §§ 48-101-513(a), (b) and (d). |
| Texas | TEX. BUS. & COM. CODE ANN. § 17.46(a). |
| Utah | UTAH CODE ANN. §§ 13-11-4(1), (2)(a), (g), (o); 13-22-13(3); and 13-26-11(1)(c). |
| Washington | WASH. REV. CODE §§ 19.86.020, 19.09.100, and 19.09.340. |

---

[4] For purposes of this Count III, Plaintiff State of Connecticut does not incorporate by reference Paragraphs 134-35.

| STATE | STATUTORY AUTHORITY |
|---|---|
| West Virginia | W. VA. CODE §§ 29-19-8 through 29-19-13; and 46A-6-101 through 46A-6-104. |
| Wyoming | WYO. STAT. ANN. § 40-12-105(a)(xv). |

## VIOLATIONS OF THE TELEMARKETING SALES RULE

213.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108, in 1994. The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310.

214.    The Telemarketing Act also authorizes attorneys general to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case to obtain damages, restitution, and other compensation on behalf of their residents. 15 U.S.C. § 6103(a).

215.    The TSR defines "charitable contribution" to mean "any donation or gift of money or any other thing of value." 16 C.F.R. § 310.2(h).

216.    The TSR defines "person" to mean "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity." 16 C.F.R. § 310.2(y).

217.   The TSR defines "telemarketer" to mean "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff).

218.   The TSR defines "telemarketing" to mean, in pertinent part, "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

219.   Defendants ACS and Directele are telemarketers engaged in telemarketing as defined by the TSR. 16 C.F.R. § 310.2(ff), and (gg).

220.   The TSR prohibits telemarketers from making a false or misleading statement to induce a charitable contribution. 16 C.F.R. § 310.3(a)(4). The TSR also prohibits telemarketers from misrepresenting, directly or by implication, the nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested and the purpose for which any charitable contribution will be used. 16 C.F.R. § 310.3(d)(1) and (3).

221.   Under the TSR, "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

222.   The TSR prohibits sellers and telemarketers from causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or

continuously with intent to annoy, abuse, or harass any person at the called number. 16 C.F.R. § 310.4(b)(1)(i).

223.   It is an abusive telemarketing act or practice and a violation of the TSR for a telemarketer to initiate an outbound telephone call that delivers a prerecorded message to induce a charitable contribution unless the call is to a member of, or previous donor to the nonprofit charitable organization on whose behalf the call is made. 16 C.F.R. § 310.4(b)(1)(v). Calls delivering prerecorded messages are commonly called "robocalls."

224.   The TSR contains an exception that permits outbound calls that deliver a prerecorded message to induce a charitable contribution if the call is to a member of, or prior donor to, the nonprofit charitable organization on whose behalf the call is made, and that, *inter alia,* in calls that could be answered in person by a consumer, the telemarketer discloses that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert an entity-specific Do Not Call request at any time during the message, and makes such an opt-out mechanism available. 16 C.F.R. § 310.4(b)(1)(v)(B)(ii)(A).

225.   The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates Sections 310.3(a), (c), (d) or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

226.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C.

§ 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation

of the TSR constitutes an unfair or deceptive act or practice in or affecting

commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV
### Deceptive Telemarketing Practices
***(By the FTC and the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia as to Defendants ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi except that Iowa, Oregon and the District of Columbia do not join in the allegations with respect to Directele)***

227.   Plaintiffs FTC and the Attorneys General of the Plaintiff States and

the Attorney General of the District of Columbia incorporate by reference

Paragraphs 52–197.[5]

228.   In numerous instances, in connection with soliciting charitable

contributions by telephone, Defendants ACS, Directele, Burland, Cole, Stepek,

Gilstorf, Lia, and Lucidi have made false or misleading statements to induce a

charitable contribution, including the misrepresentations described in Paragraphs

199-200 and 204–205.

229.   The practices of Defendants ACS, Directele, Burland, Cole, Stepek,

Gilstorf, Lia, and Lucidi as set forth in Paragraph 228 are deceptive telemarketing

---

[5] For purposes of this Count IV, Plaintiff State of Connecticut does not incorporate by reference Paragraphs 134-35.

practices that violate Sections 310.3(a)(4) and 310.3(d)(1), (3), and (4) of the TSR. 16 C.F.R. §§ 310.3(a)(4), 310.3(d)(1), (3), (4).

## COUNT V
## Repeated Harassing Calls
### *(By the FTC and the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia)*
### *(As to Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi)*

230.   Plaintiffs FTC and the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia incorporate by reference Paragraphs 52–197.

231.   In numerous instances, in connection with telemarketing, Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi have caused telephones to ring, or have engaged persons in telephone conversations, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

232.   The acts or practices of Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi as set forth in Paragraph 231 violate 16 C.F.R. § 310.4(b)(1)(i).

## COUNT VI
### Unlawful Prerecorded Messages
***(By the FTC and the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia as to Defendants ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi except that Iowa, Oregon and the District of Columbia do not join in the allegations with respect to Directele)***

233.   Plaintiffs FTC and the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia incorporate by reference Paragraphs 52–197.

234.   In connection with telemarketing, in numerous instances since at least 2016, Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi; and since at least 2020, Defendants Directele, Gilstorf, and Lia; have:

a.     Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages seeking charitable contributions from individuals who were not members of, and had not previously donated to, the charitable organizations on whose behalf the calls were made; and

b.     Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages seeking charitable contributions from individuals who had previously donated to the charitable organizations on whose behalf the calls were made, during which they did not make available to the person called an automated interactive voice or keypress-activated opt-out mechanism that would automatically add the number called to the

entity-specific "do not call" list of the nonprofit for which the solicitation

was made.

235.   The acts and practices of Defendants ACS, Directele, Burland, Cole,

Stepek, Gilstorf, Lia, and Lucidi as set forth in Paragraph 234 violate 16 C.F.R.

§ 310.4(b)(1)(v).

## COUNT VII
### Assisting and Facilitating Abusive or Deceptive Telemarketing Acts
*(By the FTC and the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia as to Defendants CPS, Dale Corp., Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi except that Iowa, Oregon and the District of Columbia do not join in the allegations with respect to Dale Corp.)*

236.   Plaintiffs FTC and the Attorneys General of the Plaintiff States and

the Attorney General of the District of Columbia incorporate by reference

Paragraphs 52–197.[6]

237.   In numerous instances, in connection with soliciting charitable

contributions by telephone, Defendants CPS, Dale Corp., Burland, Cole, Stepek,

Gilstorf, Lia, and Lucidi have provided substantial assistance or support to

telemarketers while knowing or consciously avoiding knowing that the

telemarketers were engaged in acts or practices that violate Sections 310.3(a)(4),

310.3(d)(1), (3), and (4), and 310.4(b)(1)(v) of the TSR, thereby violating Section

310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

---

[6] For purposes of this Count VII, Plaintiff State of Connecticut does not incorporate by reference Paragraphs 134-35.

## STATE LAW VIOLATIONS

### COUNT VIII
### Annoying, Abusive, Harassing, Intimidating, or Tormenting Conduct in Charitable Solicitations
### *(By Plaintiff States Nevada and Washington as to Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi)*

238.   Plaintiff States Nevada and Washington incorporate by reference Paragraphs 52–197.

239.   Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi used a telephone to contact residents of Nevada and Washington for the purpose of soliciting charitable contributions.

240.   In many instances, the solicitation telephone calls were unwanted, repeated, and continuous and, as such, would be considered by a reasonable person to be annoying, abusive, or harassing and/or would have the natural consequence of harassing, intimidating, or tormenting the person being contacted.

241.   The conduct described in Paragraphs 239–240 constitutes a "deceptive trade practice" as that term is defined by Section 598.0918(2) of the Nevada Revised Statutes as currently and previously enacted. Evidence that Defendants ACS, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi have engaged in the conduct described in Paragraphs 239–240 is prima facie evidence of their intent to injure competitors and to destroy or substantially lessen competition in the State of Nevada.

242.   The conduct described in Paragraphs 239–240 violates Section

19.09.100(17) of the Revised Code of Washington (RCW) as currently and

previously enacted. Pursuant to RCW 19.09.340, violations of the Charitable

Solicitations Act (RCW 19.09) are *per se* violations of the Washington Consumer

Protection Act (RCW 19.86).

243.   Notwithstanding the *per se* violation of Washington's Charitable

Solicitations Act, the conduct by Defendants ACS, Burland, Cole, Stepek, Gilstorf,

Lia, and Lucidi described in Paragraphs 239–240 constitutes unfair and deceptive

acts or practices in the conduct of trade or commerce, which violates RCW

19.86.020.

## COUNT IX
### Failure to Disclose the True Name of a Telephone Solicitor
***(By Plaintiff States Alabama, California, Colorado, Connecticut, Delaware,
Florida, Georgia, Illinois, Maine, New Hampshire, New Jersey, New York,
North Carolina, Ohio, Oregon, Tennessee, Utah, Virginia, Washington, and
Wisconsin as to Defendants ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia,
and Lucidi except that Oregon does not join in the allegations with respect to
Directele)***

244.   Plaintiffs Alabama, California, Colorado, Connecticut, Delaware,

Florida, Georgia, Illinois, Maine, New Hampshire, New Jersey, New York, North

Carolina, Ohio, Oregon, Tennessee, Utah, Virginia, Washington, and Wisconsin

(the "Count IX Plaintiffs") incorporate by reference Paragraphs 52–197.

245.   The laws of the Count IX Plaintiffs require that anyone soliciting for charitable contributions must clearly, unambiguously, and conspicuously disclose his or her name prior to or at the point of the solicitation.

246.   The laws of the Count IX Plaintiffs prohibit making false, deceptive, or misleading statements in the course of a charitable solicitation, including using any method to mislead the recipient of the call as to the identity of the solicitor or using a fictitious personal name.

247.   In numerous instances, Defendants ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi used, with knowledge directed the use of, or caused to be used, prerecorded messages to solicit charitable contributions that either failed to disclose the name of the person conducting the solicitation or used a false and fictitious name to mislead the recipient of the call as to the identity of the person conducting the charitable solicitation.

248.   The acts and practices of Defendants ACS, Directele, Burland, Cole, Stepek, Gilstorf, Lia, and Lucidi as set forth in Paragraph 247 violate the laws of the Count IX Plaintiffs as follows:

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 13A-9-71(p). |
| California | CAL. BUS. & PROF. CODE §§ 17200 through 17206, and 17510 through 17510.95; CAL. GOV. CODE §§ 12580 through 12599.8. |
| Colorado | Colo. Rev. Stat. § 6-1-105(1)(hh); and 6-16-105.3(d.5). |
| Connecticut | CONN. GEN. STAT. § 21a-190f(e). |

| | |
|---|---|
| Delaware | DEL. CODE ANN. tit. 6, § 2595(b)(1). |
| Florida | FLA. STAT. §§ 501.204(1); and 496.412; 496.416 (2020). |
| Georgia | GA. CODE ANN. § 43-17-8(a)(1)(2016). |
| Illinois | 225 ILL. COMP. STAT. § 460/17(a). |
| Maine | ME. REV. STAT. tit. 10, 10 § 1499-A. |
| New Hampshire | N.H. REV. STAT. ANN. § 359-E:5. |
| New Jersey | N.J. STAT. ANN. § 45:17A-32(c); and N.J. ADMIN. CODE § 13:48-11.2(a). |
| New York | N.Y. EXEC. L. § 174(3). |
| North Carolina | N.C. GEN. STAT. §§ 75-104(b)(1)c, 131F-17(a)(1), and 131F-20(1), (8), (15). |
| Ohio | OHIO REV. CODE ANN. § 1716.08(B)(1)(a). |
| Oregon | ORE. REV. STAT. § 646A.374(1)(a). |
| Tennessee | TENN. CODE ANN. § 47-18-1502. |
| Utah | UTAH CODE ANN. § 13-26-11(1)(b). |
| Virginia | VA. CODE ANN. § 57-55.2. |
| Washington | WASH. REV. CODE §§ 19.86.020, 19.09.100(1)(A), and 19.09.340. |
| Wisconsin | WIS. STAT. § 202.14(11)(a). |

## **INJURY**

249.   Donors are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and state law. In addition, Defendants have been unjustly enriched because of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure donors, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

250.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court

to grant injunctive and such other relief as the Court may deem appropriate to halt

and redress violations of any provision of law enforced by the FTC. The Court, in

the exercise of its equitable jurisdiction, may award ancillary relief, including

rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies, to prevent and remedy any violation of any

provision of law enforced by the FTC.

251.   Section 19 of the FTC Act, 15 U.S.C. § 57b, and Sections 4(a) and

6(b) of the Telemarketing Act, 15 U.S.C. §§ 6103(a) and 6105(b), authorize this

Court to grant such relief as the Court finds necessary to redress injury to the

public resulting from Defendants' violations of the Telemarketing Sales Rule,

including the rescission or reformation of contracts, and the refund of money.

252.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction

to allow the Plaintiff States to enforce their state laws against Defendants in this

Court and to grant such relief as provided under the following state laws, including

injunctive relief, rescission or reformation of contracts, restitution, the refund of

monies paid, the disgorgement of ill-gotten monies, civil penalties, attorneys' fees,

expenses, costs, and such other relief to which the Plaintiff States may be entitled:

| STATE | STATUTORY AUTHORITY |
|-------|---------------------|
| Alabama | ALA. CODE §§ 8-19-1 through -15; and 13A-9-70 through 76. |

| STATE | STATUTORY AUTHORITY |
|---|---|
| California | CAL. BUS. & PROF. CODE §§ 17200 through 17206; and 17510 through 17510.95; CAL. GOV. CODE §§ 12580 through 12599.8. |
| Colorado | COLO. REV. STAT. §§ 6-1-101 through 115; and 6-16-101 through 114. |
| Connecticut | CONN. GEN. STAT. §§ 21a-175 through 21a-190l; and 42-110a through 42-110q. |
| Delaware | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida | FLA. STAT. ch. 501, pt. II; and ch. 496 (2020). |
| Georgia | GA. CODE ANN. §§ 10-1-390 through 10-1-408 (2017); and 43-17-1 through 43-17-23 (2016). |
| Illinois | 225 ILL. COMP. STAT. §§ 460/0.01 through 460/23. |
| Indiana | IND. CODE §§ 23-7-8-1 through -9; and 24-5-0.5-1 through -12. |
| Iowa | IOWA CODE § 714.16. |
| Kansas | KAN. STAT. ANN. §§ 17-1759 through 17-1776. |
| Kentucky | KY. REV. STAT. ANN. §§ 367.110 through 367.933. |
| Louisiana | LA. REV. STAT. ANN. §§ 51:1401 through 1427; and 51:1901 through 1909.1. |
| Maine | ME. REV. STAT. tit. 5, §§ 205-A through 214 (2019). |
| Maryland | MD. CODE ANN., BUS. REG. §§ 6-101 through 6-701 (LexisNexis 2015 and 2020 Suppl.). |
| Massachusetts | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 4. |
| Michigan | MICH. COMP. LAWS §§ 400.271 through 400.294. |
| Missouri | MO. REV. STAT. ch. 407. |
| Montana | MONT. CODE ANN. §§ 30-14-131, 30-14-142, and 30-14-144. |
| Nebraska | NEB. REV. STAT. §§ 21-1901 through 21-19,177; 59-1601 through 59-1622; and 87-301 through 87-306. |
| Nevada | NEV. REV. STAT. §§ 598.1305, 598.0915(15), 598.096, and 598.0963. |
| New Hampshire | N.H. REV. STAT. ANN. §§ 7:19; 7:20; 7:21; 7:24; 7:28; 7:28-c; 7:28-f; 358-A:4; and 641:8. |
| New Jersey | N.J. STAT. ANN. §§ 45:17A-18 through 45:17A-40; 56:8-1 through 56:8-226; and N.J. ADMIN. CODE §§ 13:48-1.1 through 13:48-15.1. |
| New Mexico | N.M. STAT. ANN. 1978, §§ 57-12-1 through 57-12-22; and 57-22-1 through 57-22-11. |
| New York | N.Y. EXEC. LAW §§ 63(12) and 171-a through 175; N.Y. GEN. BUS. LAW § 349; and N.Y. NOT-FOR-PROFIT CORP. LAW § 112. |

| STATE | STATUTORY AUTHORITY |
|---|---|
| North Carolina | N.C. GEN. STAT. §§ 75-14 to 75-16.1, 75-105, and 131F-24. |
| Ohio | OHIO REV. CODE ANN. ch. 1716. |
| Oklahoma | OKLA. STAT. tit. 18 §§ 552.1 through 552.22. |
| Oregon | OR. REV. STAT. §§128.801 through 128.898, 646.605 through 646.642, 646A.370 through 646A.376, and 180.060(7). |
| Pennsylvania | PA. STAT. Title 10 §§ 162.1 through 162.24. |
| Tennessee | TENN. CODE ANN. §§ 48-101-501 through 48-101-522. |
| Texas | TEX. BUS. & COM. CODE ANN. §§ 17.41 through 17.63. |
| Utah | UTAH CODE ANN. §§13-22-1 through 13-22-23; 13-26-1 through 13-26-11; and 13-11-1 through 13-11-23. |
| Virginia | VA. CODE ANN. § 57-59(D) and (E). |
| Washington | WASH. REV. CODE §§ 19.86, 19.09, and 80.36. |
| West Virginia | W. VA. CODE §§ 29-19-1 through 15b; and 46A-1-101 through 46A-7-111. |
| Wisconsin | WIS. STAT. §§ 202.11-202.18. |
| Wyoming | WYO. STAT. ANN. §§ 40-12-101 through 114. |

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of injury during the pendency of this action and to preserve the possibility of effective final relief, including expedited discovery, a preliminary injunction and an accounting of assets;

B.     Enter a permanent injunction to prevent future violations of the FTC Act, state law, and the TSR by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to donors resulting from Defendants' violations of the FTC Act, state laws, and the

TSR, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.     Award Plaintiffs the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper; and

E.     Award Plaintiff States civil penalties for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law.

Respectfully submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

JAMES REILLY DOLAN
Acting General Counsel

CHARLES A HARWOOD
Regional Director


By: /s Tracy S. Thorleifson

Local Counsel for the
Federal Trade Commission
Pursuant to Local Rule 83.20(g):

Tracy S. Thorleifson
Colin D. A. MacDonald
Sarah A. Shifley

MATTHEW SCHNEIDER
United States Attorney
KEVIN R. ERSKINE
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone (313) 226-9610

Federal Trade Commission
915 2nd Ave., Suite 2896
Seattle, WA 98174
Email: tthorleifson@ftc.gov
cmacdonald@ftc.gov
sshifley@ftc.gov
Telephone: (206) 220-6350
Attorneys for Plaintiff Federal Trade
Commission

Signed:  January 25, 2021

**FOR THE STATE OF MICHIGAN**


By:
Wisam E. Naoum*
Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632
Naoumw1@michigan.gov
MI – P83335


Signed December 3, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF ALABAMA**

By:

Olivia W. Martin *
Assistant Attorney General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, Alabama 36104
Direct: (334) 242-7393
Olivia.Martin@AlabamaAG.gov
ASB-9038-R78O

Signed ___11 / 3ν___, 2020

* With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF CALIFORNIA**

By: _David K. Eldan_
David K. Eldan*
Deputy Attorney General
Office of the Attorney General
Charitable Trusts Section
300 S. Spring St., #1702
Los Angeles, CA 90013
(213) 269-6041
David.Eldan@doj.ca.gov
California State Bar No. 163592

Signed *December 6*, 2020

*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR JENA GRISWOLD, COLORADO
SECRETARY OF STATE**

By:  *s/ with consent of LeeAnn Morrill*
LEEANN MORRILL*
First Assistant Attorney General
Public Officials Unit / State Services Section
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Phone: (720) 508-6000
Email: leeann.morrill@coag.gov
Colo. Reg. No. 38742

Signed December 3, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF COLORADO**

By: *Jay Simonson*

JAY B. SIMONSON *
First Assistant Attorney General
Consumer Protection Unit
Colorado Attorney General's Office
1300 Broadway 7th Floor
Denver, CO 80203
(720) 508-6205
jay.simonson@coag.gov
CO Bar #24077

Signed November 11, 2020

*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF CONNECTICUT**

By:
_____
Kim Carlson McGee *
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5400
kim.mcgee@ct.gov
CT #440655


Signed November 20, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF DELAWARE**

By:/*s/ with consent of Oliver J. Cleary*
Oliver J. Cleary
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8369
Oliver.Cleary@Delaware.gov
DE # 5830


Signed November 19, 2020

**FOR THE DISTRICT OF COLUMBIA**

**KARL A. RACINE**
*Attorney General*
*District of Columbia*


By:      *s/ with consent of Kathleen Konopka*
        Kathleen Konopka* (D.C. Bar No. 495257)
        Deputy Attorney General

        Catherine A. Jackson
        (D.C. Bar No. 1005415)
        Chief, Public Integrity Section

        Leonor Miranda (D.C. Bar No. 1044293)
        Assistant Attorney General

        Office of Attorney General
        for the District of Columbia
        400 6th Street N.W., 10th Floor
        Washington, D.C. 20001
        (202) 724-6610
        Kathleen.Konopka@dc.gov
        Catherine.Jackson@dc.gov
        Leonor.Miranda@dc.gov

Signed December 4, 2020

*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF FLORIDA**

By:     */s/ with the consent of Genevieve Hall*
        Genevieve Hall, Esq.
        Senior Attorney
        Florida Department of Agriculture and
        Consumer Services
        407 South Calhoun Street
        Tallahassee, Florida 32399
        (850) 245-1025
        Genevieve.Hall@FDACS.gov
        FL 724661

        Signed December 4, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF FLORIDA**
**ASHLEY MOODY**
**Attorney General**

By: */s/* with the consent of Ellen Annaliese Bullock
Ellen Annaliese Bullock *
Assistant Attorney General

*/s/* with the consent of Victoria Ann Butler
Victoria Ann Butler
Director of Consumer Protection
Donna Cecilia Valin
Orlando Bureau Chief
Office of Attorney General
State of Florida
Department of Legal Affairs
Consumer Protection Division
135 W. Central Blvd., Suite 1000
Orlando, Fl 32801
(407) 316-4840
Ellen.Bullock@myfloridalegal.com
FBN 102980
Donna.Valin@myfloridalegal.com
FBN 96687
Victoria.Butler@myfloridalegal.com
FBN 861250


Signed January 14, 2021


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF GEORGIA**

By:     <u>s/with consent of *Daniel S. Walsh*</u>
        Daniel S. Walsh*
        Senior Assistant Attorney General
        Department of Law
        State of Georgia
        40 Capitol Square, SW
        Atlanta, Georgia 30334-1300
        (404) 458-3558
        dwalsh@law.ga.gov
        Ga. Bar. No. 735040


Signed <u>December 4</u>, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF ILLINOIS**

By:        BARRY S. GOLDBERG – IL Bar No. 6269821
           KRISTIN C. LOUIS – IL Bar No. 6255714
           Assistant Attorneys General
           Office of the Attorney General Kwame Raoul
           Charitable Trust Bureau
           100 West Randolph Street, 11th Floor
           Chicago, Illinois  60601-3175
           Telephone:  (312) 814-2595
           Email: bgoldberg@atg.state.il.us
           Email: klouis@atg.state.il.us


           Signed:  January 19, 2021


           *With consent to this Complaint being filed by the
           Federal Trade Commission.

**FOR THE STATE OF INDIANA**


By:

Tamara Weaver *
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington St.
Indianapolis, IN 46204
(317) 234-7122
Tamara.Weaver@atg.in.gov
IN 28494-64


Signed November 19, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF IOWA**

By: _____

J. Andrew Cederdahl *
Assistant Attorney General
Office of the Attorney General of Iowa
Hoover State Office Building
1305 E. Walnut St.
Des Moines, Iowa 50319-0106
(515) 281-5926
Andrew.Cederdahl@ag.iowa.gov
IA, AT0012249


Signed November 17, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF KANSAS**

By:      s/ with consent of Kathleen Barceleau
Kathleen Barceleau (nee Mullally) *
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, Ste. 300
Topeka, KS 66612-1597
(785) 296-2215
kathleen.barceleau@ag.ks.gov
MI #83169

Signed December 2, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE COMMONWEATLH OF KENTUCKY**

11/30, 2020

By: Rebecca Price

Rebecca Price
Kentucky Office of the Attorney General
Assistant Attorney General
Consumer Protection Division
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5446
rebecca.price@ky.gov
Kentucky Bar # 97312

*With consent to this Stipulated Final Order and Permanent Injunction being filed by the Federal Trade Commission.

**FOR THE STATE OF LOUISIANA**

By: *Cathryn E. Gits*
Cathryn E. Gits *
Assistant Attorney General
Office of Attorney General Jeff Landry
1885 N. Third Street
Baton Rouge, LA 70802
225-326-6414
gitsc@ag.louisiana.gov
La. Bar Roll Number: 35144

Signed 12- 4 _____, 2020

*With consent to this Complaint being filed by the
Federal Trade Commission.

## FOR THE STATE OF MAINE

December 4, 2020          By:     /s/with consent of Linda Conti_____
                                 Linda J. Conti
                                 Assistant Attorney General
                                 Office of Attorney General of Maine
                                 6 State House Station
                                 Augusta, Maine 04333-0006
                                 (207) 626-8591
                                 linda.conti@maine.gov
                                 ME Bar No. 3638

                                 *With consent to this Stipulated Final Order
                                 and Permanent Injunction being filed by the
                                 Federal Trade Commission.

**FOR THE STATE OF MARYLAND**

BRIAN E. FROSH
Attorney General of Maryland

By: _Josaphine B. Yuzuik_
JOSAPHINE B. YUZUIK *
Assistant Attorney General
Office of the Attorney General
Office of the Secretary of State
16 Francis Street
Annapolis, Maryland 21401
(410) 260-3855
josaphine.yuzuik@maryland.gov


Signed _December 8_, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE COMMONWEALTH
OF MASSACHUSETTS**

By:    /s/ with consent of Matthew M. Lyons
Matthew M. Lyons*
Assistant Attorney General
Non-Profit Organizations/
Public Charities Division
Office of Attorney General Maura Healey
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
matthew.lyons@mass.gov
MA BBO No. 657685


Signed November 20, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF MISSOURI**

By: _____

Michelle Hinkl *
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
(314) 340-7961
michelle.hinkl@ago.mo.gov
MO64494


Signed _November 17_ , 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF MONTANA**

By:

Mark Mattioli *
Chief, Office of Consumer Protection
MT Bar Number 2927
Caitlin Buzzas *
Assistant Attorney General
MT Bar Number 58624658
Montana Office of Attorney General
P.O. Box 200151
Helena, MT 59620-0151
406-444-2026
mmattioli@mt.gov
caitlinbuzzas@mt.gov
Signed December 4, 2020

*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF NEBRASKA**
Douglas J. Peterson, #18146
Nebraska Attorney General

By: _____
Jocelyn J. Brasher*
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509-8920
(402) 471-2693
jocelyn.brasher@nebraska.gov
NE, #26011


Signed: <u>November 30, 2020</u>


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF NEVADA**

By:  /s/ with the consent of Whitney F. Digesti
Senior Deputy Attorney General
Office of Attorney General of Nevada
100 N. Carson St.
Carson City, NV 89701
Tel.: 775-684-1169
Wdigesti@ag.nv.gov
Nevada Bar Number: 13012


Signed January 22, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF NEW HAMPSHIRE**

By: _____

Thomas J. Donovan
Director of Charitable Trusts
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
(603)271-3658
attorneygeneral@doj.nh.gov
NH Bar # 664

Signed _November 20_, 2020

*With consent to this Complaint being filed by the Federal Trade Commission.

**FOR THE STATE OF NEW JERSEY**

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:  s/ with consent of Monisha A. Kumar
Monisha A. Kumar *
Deputy Attorney General

State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
(973) 648-3070
Monisha.Kumar@law.njoag.gov
NJ Attorney No. 900212012


Signed December 4, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF NEW MEXICO**

**HECTOR H. BALDERAS**
**Attorney General**

By:*/s/ with consent of Mark F. Swanson*


Mark F. Swanson
Assistant Attorney General
Office of the New Mexico Attorney General
408 Galisteo St.
Santa Fe, NM 87504
(505) 490-4885
mswanson@nmag.gov
NM#145735


Signed December 14, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF NEW YORK**

LETITIA JAMES, ATTORNEY GENERAL OF
THE STATE OF NEW YORK

By: s/with the consent of Peggy J. Farber
Peggy J. Farber *
Assistant Attorney General
New York State Attorney General's Office
Charities Bureau
28 Liberty Street, 19th Floor
New York, New York 10005
(212) 416-8785
Peggy.Farber@ag.ny.gov
NY 4342655


Signed December 4, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE NORTH CAROLINA
DEPARTMENT OF THE SECRETARY
OF STATE**

By:

Jeremy D. Lindsley *
Assistant Attorney General
Attorney for the NC Dept. of the Secretary of State
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6815
jlindsley@ncdoj.gov
NC Bar No. 26235


Signed November 18, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF NORTH CAROLINA**

By:   s/with consent of Llogan R. Walters
LLOGAN R. WALTERS*
NC Bar No. 51050
TRACY NAYER*
NC Bar No. 36964
Assistant Attorneys General
North Carolina Department of Justice
P.O. Box 629
Raleigh, North Carolina 27602
(919) 716-6000
lwalters@ncdoj.gov
tnayer@ncdoj.gov


Signed December 4, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF OHIO**

By: _____

Abigail A. K. Jacobs *

Senior Assistant Attorney General

Office of Attorney General Dave Yost

150 E. Gay St., 23rd Floor

Columbus, OH 43215

(614) 466-3181

Abigail.Jacobs@OhioAttorneyGeneral.gov

OH 0088091

Signed November 30, 2020

*With consent to this Complaint being filed by the Federal Trade Commission.

**FOR THE STATE OF OKLAHOMA**

By: _____

Malisa McPherson *
Deputy Chief Assistant Attorney General
Office of Attorney General Mike Hunter
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
(405) 521-3921
Malisa.McPherson@oag.ok.gov
OK #32070


Signed December 4, 2020


*With consent to this Complaint being filed by the Federal Trade Commission.

**FOR THE STATE OF OREGON**

By: *Heather L. Weigler*

     Heather L. Weigler
     Senior Assistant Attorney General
     Oregon Department of Justice
     100 SW Market Street, 4th Floor
     (971) 673-1880
     Heather.l.weigler@doj.state.or.us
     OR 035900

Signed November 19, 2020

*With consent to this Complaint being filed by the Federal Trade Commission.

**COMMONWEALTH OF PENNSYLVANIA**
**JOSH SHAPIRO,** Attorney General*

By:  _____
Mark A. Pacella
Chief Deputy Attorney General
PA 42214
Lisa M. Rhode
Senior Deputy Attorney General
PA 64556
Charitable Trusts and Organizations Section
14TH Fl., Strawberry Square
Harrisburg, PA 17120
717.705.2536
mpacella@attorneygeneral.gov
lrhode@attorneygeneral.gov

Signed ___Dec. 4_____, 2020

*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF TENNESSEE**

By: _____

[Janet M. Kleinfelter] *
Deputy Attorney General
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN  37202
(615) 741-7403
TN Bar # 018339


Signed _November 4_ , 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF TEXAS**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation


By: _____
Scot M. Graydon *
Assistant Attorney General, General Litigation
Office of Attorney General of Texas
300 W. 15th St., WPC Bldg., 11th Fl.
Austin, Texas 78701
(512) 463-2120
Scot.Graydon@oag.texas.gov
Texas Bar No. 24002175


Signed December 4 , 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF UTAH**

By:  <u>s/ with consent of Sterling R. Corbett</u>
Sterling R. Corbett
Assistant Attorney General
Counsel for Utah Division of Consumer Protection
Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140872
Salt Lake City, UT 84114-0872
(801) 366-0310
sterlingc@agutah.gov
UT 12319


Signed December 4, 2020.


*With consent to this Complaint being filed by the
Federal Trade Commission.

**COMMONWEALTH OF VIRGINIA,**
*EX REL.* **MARK R. HERRING,**
**ATTORNEY GENERAL**

By: _____

Mark S. Kubiak VA Bar No. 73119 *
Stephen John Sovinsky VA Bar No. 85637
Assistant Attorneys General
Office of Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7364
mkubiak@oag.state.va.us


Signed: <u>November 20, 2020</u>


\*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF WASHINGTON**

By: _____
JOSHUA STUDOR*
Assistant Attorney General
Office of Attorney General Robert W. Ferguson
800 Fifth Ave., Suite 2000
Seattle, WA 98104
(206) 464-7744
Joshua.Studor@atg.wa.gov
JGS, WSBA No. 47183

_____
Signed December 9, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF WEST VIRGINIA**

By: _____

Tanya L. Godfrey*
Assistant Attorney General
Office of the West Virginia Attorney General
Consumer Protection & Antitrust Division
812 Quarrier Street, 1st Floor
PO Box 1789
Charleston, WV 25326
(304) 558-8986
Tanya.L.Godfrey@wvago.gov
WV Bar Id. No. 7448

Signed: December 4, 2020


*With consent to this Complaint being filed by the
Federal Trade Commission.

**FOR THE STATE OF WISCONSIN**
**JOSHUA L. KAUL**
*Attorney General*


November 24, 2020          By:     s/with consent of Shannon A. Conlin
                                   Shannon A. Conlin
                                   Assistant Attorney General
                                   Office of Attorney General of Wisconsin
                                   17 West Main Street
                                   PO Box 7857
                                   Madison, WI 53711
                                   (608)266-1677
                                   conlinsa@doj.state.wi.us
                                   WI Bar No. 1089101

                                   *With consent to this Stipulated Final Order and
                                   Permanent Injunction being filed by the Federal
                                   Trade Commission.

**FOR THE STATE OF WYOMING\***

BRIDGET HILL
Attorney General

By: _Kit Wendtland_

Kit Wendtland
Assistant Attorney General
State of Wyoming
WY Bar No. 7-6276
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-3795
kit.wendtland@wyo.gov
*Counsel of Record for the State of Wyoming*

Signed _November  18_ , 2020

\*With consent to this Complaint being filed by the
Federal Trade Commission.